OPINION AND ORDER
 

 SARGUS, District Judge.
 

 Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court an action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the habeas corpus petition, (doc.no.14), respondent’s return of writ, (doc.no.18), and petitioner’s traverse, (doc.no.47). Also before the Court is the original joint appendix, which consists of ten volumes.
 

 The facts and procedural history of this case were set forth by the Supreme Court of Ohio in
 
 State v. Benge,
 
 75 Ohio St.3d 136, 661 N.E.2d 1019 (1996):
 

 In the early morning hours of February 1, 1993, a car belonging to Judith Gabbard, defendant-appellant Michael W. Benge’s live-in girlfriend, was found abandoned on the west side of the Miami River in Hamilton, Ohio. The vehicle was found near the river with the front passenger-side tire stuck in a gully. After the vehicle was towed to the impound lot, the tow-truck operator observed blood on the front bumper and passenger side of the car and notified police.
 

 The police returned to the area where the car was found and discovered the body of Judith Gabbard in the Miami River. Her body had been weighed down with a thirty-five pound piece of concrete which had been placed upon her head and chest. One of the pockets on the jacket Gabbard was wearing was empty and turned inside out. She still had in her possession her checkbook, cash and jewelry. The police retrieved a tire iron, or lug wrench, from the river approximately twelve to fifteen feet from where Gabbard’s body was found. A jack and spare tire were found in Gabbard’s trunk, but no lug wrench was discovered. Police removed lug nuts from the vehicle, which were sent to a laboratory and compared with the lug wrench. Although no positive match was made, the lug nuts did bear markings which were similar to the lug wrench.
 

 The police gathered other physical evidence from the scene which was also tested by a forensic laboratory. Strands of hair and type A blood (which both
 
 *MXXVII
 
 Gabbard and appellant had) were found on the driver’s side front tire. Smears of blood were also discovered above the passenger-side headlight and on the fender. Police also found a pool of blood with a tire track through it and blood contained in the tire treads. According to one of the investigative detectives, this evidence indicated that the car had been driven through the blood and through the hair of the victim.
 

 An autopsy was performed, which revealed that the victim had suffered a number of blows to the head with a long blunt object which produced pattern abrasions and multiple skull fractures, one of which was circular in nature. According to the coroner, the victim died of brain injuries secondary to multiple skull fractures which were inflicted with a blunt object.
 

 The police apprehended Benge the next day, on February 2, 1993. When the detectives approached Benge, on the street, they observed him drop Judith Gabbard’s ATM card to the ground. They picked up the card, arrested Benge, and took him into the station for questioning. After being read his Miranda warnings, Benge agreed to talk to the detectives. Benge told police that two black men in a Bronco had chased him and Gabbard to the river and that their car had gotten stuck. Benge claimed that one of the men injured Gabbard and took her ATM card while the other held him at gunpoint, demanding the ATM code word. When Benge refused to tell him, the man returned the ATM card to him. Benge escaped by jumping into the river. As he swam away, he heard Gabbard screaming as the men beat her. The detectives told Benge they did not believe his story. Benge told them he thought he should talk to a lawyer. The questioning ceased at that point.
 

 A short time later, Benge told police he was willing to talk. Benge signed a Miranda warning card indicating that he waived his Miranda rights. Benge then gave the police a tape-recorded statement in which he recounted a different version of what happened the night before. Benge told police that he had driven to the riverbank with Gabbard so that they could talk. He said that they had argued over the fact that he was addicted to crack cocaine. Gabbard also accused him of being unfaithful to her. Benge then said he got out of the vehicle to urinate. At that point, he said Gab-bard tried to run him down, but the car got stuck in the mud. Benge said that he became enraged, pulled Gabbard out of the car, and began beating her with a metal pipe he found lying on the ground. Benge said he threw her body into the river, face down, disposed of the weapon and swam across the river. He did not recall whether he put any rocks or cement on her body. Benge then went to the home of his friend, John Fuller, to get dry clothes, which Fuller’s fiancee, Awantha Shields, provided.
 

 During this second interrogation, Benge was questioned about the ATM card, why he had dropped it when he saw the police, and whether he had used it after killing Gabbard. Benge said he threw down the card because he was scared and he knew he would not need it anymore. He also told police that he had not used the card since he killed Gabbard, although he did allow a man by the name of Baron Carr to use the card once to get money to purchase crack cocaine. Benge claimed that the only reason he had the card in his possession was because he and Gabbard had used it on January 31, 1993 before they went out that evening. However, the police discovered through retrieving ATM records that no transaction had
 
 *MXXVIII
 
 taken place on January 31,1993 and that two transactions were made following Gabbard’s death; on February 1, 1993 at 2:45 a.m., a $200 withdrawal was made, and on February 2, 1993 at 12:01 a.m., another $200 was withdrawn.
 

 Benge was indicted on one count of aggravated murder in violation of R.C. 2903.01(B) with death penalty specifications under R.C. 2929.04(A)(3)(offense committed for the. purpose of escaping detection for another offense) and R.C. 2929.04(A)(7)(offense committed during the commission of an aggravated robbery) as well as for aggravated robbery and gross abuse of a corpse. Benge pleaded no contest to gross abuse of a corpse. The case proceeded to trial on the other charges.
 

 At trial, the state called Awantha Shields, who testified that in the early morning hours of February 1, 1993, Benge arrived at the house she shared with John Fuller, wearing wet clothes and asking for John. Benge also asked her if she had ever killed anyone. He then told her that he and his girlfriend had “got into it” earlier, that it blew over, and that they went to the river bank. He then told her that they had started fighting and that he hit her in the head no more than ten times with a crowbar, put rocks over her head and pushed her in the river. Benge told her that he had killed his girlfriend to get her “Jeanie” card. He also said that if the police questioned him he would lie and say that a couple of black guys jumped him and his girlfriend and beat his girlfriend up. He also told her that he had given her ATM card to a guy named Baron to get $200 to buy crack cocaine but that he never saw the money.
 

 Larry Carter testified that he and Baron Carr ran into Benge in the early morning of February 1, 1993. Benge, whose clothes were wet, asked Carter to excuse how he smelled but that he had just swum in the river. Carter thought Benge was kidding. Benge told him he had given John $20 to buy crack cocaine for him and said he could get more money. Carter drove Benge and Carr to a Society Bank where Benge withdrew $200 from an ATM; Carter then bought crack cocaine for Benge. Carter later drove Benge to Fuller’s house. Later that next night, Carter and Baron Carr withdrew another $200 from Gab-bard’s account using her ATM card so that they could buy drugs for Benge. However, to avoid giving the drugs or money to Benge, the two men conjured up a story and told Benge that his girlfriend had closed the account. Benge insisted that she had not.
 

 Benge took the stand on his own behalf and reiterated what he had told police during his second interrogation, including that Gabbard had tried to run him down and that he was in a rage when he killed her. Benge also claimed that he had permission to use Gabbard’s ATM card and did not rob her. On cross-examination, he admitted losing his job in January 1993 due to his crack cocaine habit and that he had no income at the time he killed Gabbard.
 

 Benge was convicted of all counts and specifications. Thereafter, the jury recommended that he be sentenced to death, and that recommendation was accepted by the trial court. The court of appeals affirmed Benge’s convictions and death sentence.
 

 Benge,
 
 75 Ohio St.3d at 136-39, 661 N.E.2d 1019.
 

 Petitioner has raised sixteen claims for relief in this habeas corpus action and many of those claims contain sub-parts. In its
 
 Opinion and Order
 
 of March 31, 2000, the Court determined that claims one, nine, ten, and fourteen were barred
 
 *MXXIX
 
 by procedural default. Petitioner filed a motion for reconsideration of the Court’s order as to claim one, which motion this Court denied on September 21, 2000, (doc. no.45). Thus, this order will address the merits of the claims that are properly before the Court.
 

 I. Standard of Review
 

 Because petitioner filed his habeas corpus petition on November 16, 1998, his habeas corpus action is governed by the habeas corpus statute as amended by the Antiterrorism and Effective Death Penalty Act of 1996, (“AEDPA”).
 
 See Lindh v. Murphy,
 
 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997);
 
 Harpster v. Ohio,
 
 128 F.3d 322, 326 (6th Cir.1997),
 
 cert. denied,
 
 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998). According to the AEDPA, this Court may not grant relief on any claim that was adjudicated on the merits by the state courts unless that adjudication: “(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). In
 
 Williams v. Taylor,
 
 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court held that a state court decision is “contrary to” clearly established federal law “if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.” By contrast, the Supreme Court went on to hold, a state court adjudication involves an “unreasonable application” of clearly established federal law if “the state court identifies the correct legal principle from this Court’s decision but unreasonably applies that principle to the facts of the prisoner’s case.”
 
 Id.
 
 With respect to its “unreasonable application” holding, the Supreme Court emphasized that a federal habeas court may not issue the writ “simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.”
 
 Id.
 
 at 410, 120 S.Ct. 1495. Rather, a federal habeas court may issue the writ only if the state court’s application of clearly established federal law was objectively unreasonable.
 
 [1]
 

 Id.
 

 The deferential standard of review set forth in § 2254(d), by the very language at the beginning of that section, applies only when a claim is
 
 adjudicated on the merits
 
 by the state courts.
 
 Maples v. Stegall,
 
 340 F.3d 433, 436 (6th Cir.2003). Where the state court fails to “assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.”
 
 Id.
 
 (citing
 
 Williams v. Coyle,
 
 260 F.3d 684, 706 (6th Cir.2001)). That is, where the federal court’s review of a constitutional claim is not circumscribed by a reasoned state court decision, the Court is not required to determine whether the state court contravened or unreasonably applied clearly established federal law; rather, the Court conducts de novo review of the claim.
 
 Id.
 
 at 436-37 (discussing
 
 Wiggins v. Smith,
 
 539 U.S. 510, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003)).
 

 
 *MXXX
 
 II. Discussion
 

 First Ground for Relief
 
 — Petitioner
 
 was denied the right to a fair trial, due process of law, compulsory due process, the right to present a defense, and the right to have that defense considered by the jury because the trial court instructed the jury in a manner that precluded it from considering the affirmative defense of voluntary manslaughter in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution
 

 The petitioner claims in his first ground for relief that he was denied a fair trial and due process of law in that the trial court erroneously instructed the jury in a manner that precluded it from considering voluntary manslaughter as an alternative to aggravated murder. Specifically, petitioner contends that the trial court erred in instructing the jury that if it found him guilty of aggravated murder beyond a reasonable doubt that it should not consider the lesser charge of voluntary manslaughter. The instructions given in this case directed the jury to first consider the offense charged in the indictment which was aggravated murder. The jury was also instructed that only if it found (1) the defendant not guilty of aggravated murder or (2) was unable to reach a unanimous verdict on aggravated murder could it then consider the lesser included offense of voluntary manslaughter.
 

 Petitioner contends that the jury was not permitted to consider whether he had acted under mitigating circumstances of sudden passion or a sudden fit of rage in response to serious provocation by the victim. The Ohio Supreme Court found merit to this claim of the petitioner and agreed that the jury should have been instructed to consider the charge of voluntary manslaughter.
 
 State v. Benge,
 
 75 Ohio St.3d 136, 140, 661 N.E.2d 1019 (1996). The Ohio Supreme Court nonetheless concluded that because petitioner’s counsel had failed to object to the trial court’s instructions that such error did not require reversal unless “the outcome of the trial clearly would have been otherwise.”
 
 Id.
 
 141, 661 N.E.2d 1019
 
 citing State v. Long,
 
 53 Ohio-St.2d 91, 372 N.E.2d 804 (1978). The Ohio Supreme Court concluded that the only evidence of provocation was petitioner’s testimony.
 
 Id.
 
 In contrast, other witnesses contradicted petitioner and the physical evidence in the case indicated that the auto had been driven through a pool of blood following the beating of the victim.
 
 Id.
 

 This Court previously held that claim one was proeedurally defaulted because petitioner failed to raise an objection during trial to the challenged jury instructions. Petitioner contended, however, that the default was excused because of the ineffectiveness of his trial attorneys. Under
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), petitioner is required to demonstrate deficient performance by his attorneys as well as actual prejudice. This Court concluded, as did the Ohio Supreme Court, that the instruction regarding voluntary manslaughter given by the trial court was erroneous. Thus, petitioner has established that his trial counsel was deficient. This Court also concluded, however, that petitioner could not show prejudice and found that
 

 ... it is all but certain from the record that this jury would not have acquitted petitioner of the offenses of aggravated murder and aggravated robbery, and convicted him instead of voluntary manslaughter. That the jury convicted petitioner on both the aggravated robbery specification and the separate aggravated robbery count confirms that the jury had rejected petitioner’s version of the events, i.e., that he had killed the victim in a sudden fit of rage, and that the jury had been persuaded beyond a reasonable doubt of the state’s version of the
 
 *MXXXI
 
 events— namely, that petitioner had killed the victim, stolen her bank access card with the intent to drain her bank account and purchase drugs, and concocted a cover story. There was no evidence beyond petitioner’s own testimony to corroborate his claim that the victim provoked him by driving the car towards him and, in fact, the physical evidence belied petitioner’s assertion. The record contained physical evidence that the car was not moved until after the victim had been murdered. The record was also replete with evidence contradicting petitioner’s assertion that he killed the victim — not to rob her of her bank access card — but in a sudden fit of rage. Specifically, the record contained testimony that petitioner had murdered the victim for her “Jeanie” card and had even concocted a cover story of how two other men had murdered her, and evidence that the victim’s bank card had been used after her death, contradicting petitioner’s claim that he was in possession of the victim’s “Jeanie” card only because he and the victim had made a cash withdrawal the morning of the killing. This Court cannot find under virtually any standard, even one most favorable to petitioner, that, but for counsel’s failure to object to the voluntary manslaughter instruction, the outcome of the trial probably would have been different.
 

 (Opinion and Order, Doc. No. 40 at 29-30).
 

 Petitioner contends that this Court is bound by the decision of
 
 Barker v. Yukins,
 
 199 F.3d 867 (6th Cir.1999). In
 
 Barker,
 
 the petitioner had been convicted in state court of first degree murder.
 
 Id.
 
 869. The petitioner, in her early twenty’s at the time of the charged conduct, was accused of stabbing and beating to death an eighty-one year old man. She contended that she used deadly force to prevent him from raping her.
 
 Id.
 
 Over the petitioner’s objection, the trial court rejected a proposed instruction regarding self-defense to prevent a rape and concluded that no reasonable jury could believe that deadly force was necessary to prevent a rape by an eighty-one year old, frail victim. Instead, the trial court gave the jury a general instruction on the issue of self defense, advising the jury that a defendant could use deadly force “if the defendant believed she was in danger of death or serious bodily harm.”
 
 Id.
 
 871. The Michigan Supreme Court found that the instruction was erroneous by failing to advise that deadly forced could be used to prevent a rape.
 
 Id.
 
 869. Nevertheless, the Michigan Supreme Court concluded that the error was harmless.
 
 Id.
 

 The Sixth Circuit found that the right to trial by jury prohibits judges from weighing evidence and making credibility determinations, matters which are reserved to the province of the jury.
 
 Id.
 
 874. In essence, the trial court weighed the testimony given by petitioner against the other circumstances of the case. The Court of Appeals concluded that the defective instructions undermined the petitioner’s defense and prevented the jury from deciding a critical issue in the case.
 

 While the jury instructions in this case were also defective, petitioner’s counsel did not object to the defective instruction. Consequently, petitioner must satisfy the requirement of
 
 Strickland,
 
 and prove both deficient performance by his counsel resulting in prejudice, in order to excuse the default of his claim. He must establish “a reasonable probability.. .sufficient to undermined confidence in the outcome.”
 
 Id.
 
 at 694, 104 S.Ct. 2052.
 

 This Court again analyzes this claim with the knowledge that a petitioner on death row was tried before a jury that was given an erroneous jury instruction. This Court is most reluctant to deny relief on such a claim were it not convinced that the error in question did not effect the reliability of the verdict in this case. Petitioner
 
 *MXXXII
 
 contended at trial that the victim tried to run him over with a vehicle causing him to become enraged. (J.A. 3803). He also denied that he had any intent to rob her of the ATM card. (J.A. 3810). In contrast, the prosecution contended that petitioner robbed the victim and killed her in the course of the crime.
 

 At trial, the petitioner called two witnesses in support of his defense of sudden rage in reaction to provocation by the victim. The first witness was Hallie Jo Ha-sky who reported the victim missing. (J.A. 3780). She told officers that Ms. Gabbard had been upset and was having difficulties with her boyfriend, the petitioner. (J.A. 3781). At best, her testimony suggested that she was concerned about the victim’s emotional well being prior to the murder. Hasky’s testimony did not otherwise advance the petitioner’s defense that he acted in a sudden rage under provocation.
 

 The petitioner himself was the only other witness called in his defense. The Court has again reviewed and re-reviewed in detail petitioner’s testimony at trial. Petitioner testified that earlier in the day he had taken his wife to work. (J.A. 3797). He then smoked crack with friends and failed to return to pick her up upon the completion of her shift. (J.A. 3797). He later met up with her at their mutual residence. Because he had forgotten to pick her up from work, Ms. Gabbard was angry. (J.A. 3798).
 

 According to petitioner, the two then went to a bar and consumed alcohol. (J.A. 3798). Later, Ms. Gabbard drove the two of them to a secluded area near the Champion Wastewater Treatment Plant near a river. According to petitioner, Ms. Gab-bard accused him of having an affair. He then left the car. (J.A. 3802). Petitioner testified that Ms. Gabbard then drove the vehicle at him at a high rate of speed. (J.A. 3803). He leaped out of the path of the vehicle and barely escaped being struck by the automobile. (J.A. 3803).
 

 Again according to petitioner, Ms. Gab-bard drove the car into deep mud, which caused the vehicle to stop. In a panic and rage, he contends that he then ran towards the vehicle. Petitioner testified that Ms. Gabbard came out of the car and the two of them began to fight. He then claimed that as they fell to the ground, he became aware of a metal object which he then used to bludgeon her approximately ten times. (J.A. 3806, 3845). He admitted that he dragged her to the river and placed her face down in the water.
 

 Significantly, petitioner testified that he was in possession of Ms. Gabbard’s ATM bank card before he took her to work earlier in the day. He denied ever having robbed her of the bank card. He admitted that the card was used after her death, but contended that he gave the card to a friend who had agreed to use the card to bring back either cash or crack cocaine
 

 The jury convicted petitioner of both aggravated murder and aggravated robbery. In theory, petitioner could have been found guilty of aggravated robbery without having been found guilty of aggravated murder. While such a scenario is at least possible, the testimony given by petitioner cannot support such a conclusion.
 

 In short, the jury was required to weigh petitioner’s testimony against the other evidence of record to determine whether the victim had provoked petitioner or whether petitioner had acted so as to commit aggravated robbery and aggravated murder. If the jury believed that petitioner had the card before the murder, the jury would not have convicted him of aggravated robbery. Given petitioner’s testimony, which was the only evidence offered regarding the issue of provocation and sudden rage, the jury clearly rejected petitioner’s version of events by finding him guilty of aggravated robbery.
 

 
 *MXXXIII
 
 It is in this context that the Court must consider whether the error included in the jury instructions regarding the defense of voluntary manslaughter should result in the issuance of a writ of habeas corpus. If there was any issue for the jury to weigh concerning petitioner’s claim of sudden passion and provocation, the fact that other evidence may demonstrate his guilt would not suffice, since, as
 
 Barker
 
 holds, such a weighing of the evidence is for a jury and not a judge. In this case, however, the Court is convinced that by finding petitioner guilty of aggravated robbery and aggravated murder, the jury necessarily rejected his defense of sudden passion and provocation. This case reveals an error of law within the jury instructions that simply had no effect on the outcome of the case. While the mistake raised the potential for an improper verdict, given the jury’s conclusions on both counts of convictions, it is impossible to conclude that the mistake had any bearing on the conclusions reached by the jury in this case. Ultimately, the error had no impact on the presentation of evidence, the deliberations of the jury, or the verdicts of guilty returned in the case.
 

 For these reasons, the first claim for relief is overruled.
 

 Second Ground for Relief
 
 — Petitioner
 
 Benge’s conviction and/or sentences are void or voidable because the prosecutor suppressed exculpatory evidence at his capital trial
 

 In the petitioner’s second claim for relief, petitioner contends that the State withheld exculpatory evidence and knowingly presented false testimony at trial. He contends that Awantha Shields falsely testified that petitioner told her that he had killed Ms. Gabbard to obtain and use her ATM card. Counsel for the petitioner located Awantha Shields on March 5, 2001. To their credit, counsel forthrightly acknowledged that she did not produce any evidence or testimony in support of this claim for relief. Petitioner asked the Court to review the grand jury transcript of Awantha Shields’ testimony to determine whether there is any evidence contained therein in support of this claim. Further, the petitioner acknowledges that if no such evidence in support of the claim is found in the grand jury transcript, he intends to withdraw this claim.
 

 This Court has carefully reviewed the grand jury testimony given by Awantha Shields on March 3, 1993. The Court has also reviewed the testimony given by Awantha Shields in the jury trial conducted in May of 1993. The Court can find no evidence in the grand jury testimony or trial testimony to indicate that Awantha Shields lied when she testified that the petitioner told her that he killed Ms. Gab-bard. Further, there is no evidence in either the grand jury or trial testimony of Awantha Shields that would lead to even a reasonable suspicion that she lied because she had been threatened by prosecutors or was given a promise of leniency towards her boyfriend, John Fuller.
 

 As requested by the petitioner, the Court has completed its
 
 in camera
 
 review of the Grand Jury testimony. Further, given the petitioner’s request, the Court considers the claim to be withdrawn, in that no evidence is contained in the Grand Jury testimony of Awantha Shields that would indicate that her testimony at trial was false.
 

 Third Ground for Relief
 
 — Petitioner
 
 Benge’s convictions and sentences are void and/or voidable because a conflict of interest existed with his trial counsel, Craig Hedric, which prevented him from rendering effective assistance of counsel to Benge as required by the Sixth Amendment of the United States Constitution
 

 Petitioner argues in his third claim for relief that one of his defense attorneys,
 
 *MXXXIV
 
 Craig Hedric, labored under an actual conflict of interest that prevented Mr. Hedric from providing effective assistance of counsel as required by the Sixth Amendment. Specifically, petitioner contends that his attorneys were prevented, by virtue of the conflict of interest under which Mr. Hedric labored, from discovering and presenting the testimony of a witness who could have both undermined the testimony of a key prosecution witness and bolstered petitioner’s own testimony.
 

 Petitioner’s allegations center on the fact that Mr. Hedric, at the time he was representing petitioner, was also representing John Fuller on unrelated drug charges. John Fuller was an acquaintance of petitioner’s and the live-in boyfriend of prosecution witness Awantha Shields. According to petitioner, John Fuller refused to discuss with Mr. Hedric knowledge he had regarding petitioner’s case because he was angry that Mr. Hedric appeared to be focusing all of his efforts on petitioner’s case and paying insufficient attention to the drug charges that he (Fuller) was facing. Petitioner maintains that John Fuller, who lived with Awantha Shields, could have testified that petitioner and Ms. Shields were never alone following the murder of Judith Gabbard, and that petitioner accordingly could not have told Ms. Shields that he had killed Ms. Gabbard to obtain her bank card, as Awantha Shields testified. That testimony, petitioner reasons, would have undermined the state’s theory that petitioner had killed Ms. Gab-bard to steal her bank card and corroborated his testimony that he had killed Ms. Gabbard in a fit of rage after she attempted to run him over with a car.
 

 Petitioner raised these allegations in his state postconviction action, (J.A. Vol. V, at 2012-14), and supported them with an affidavit executed by John Fuller in August of 1996. (J.A. Vol. V, at 2045-46). Upon consideration of the trial transcript, Fuller’s May 6, 1997 deposition, Fuller’s 1996 affidavit attached as exhibit 1 in support of the postconviction petition, Fuller’s March 3, 1993 testimony before the grand jury, and Fuller’s February 22, 1993 written witness statement, (which was affixed as exhibit A to the transcript of his deposition testimony), the trial court rejected petitioner’s conflict of interest claim. (J.A. Vol. V, at 2620-2631). The trial court found that Fuller had in fact refused to discuss his knowledge of petitioner’s case with petitioner’s defense attorneys. The trial court concluded, however, that Fuller’s case and petitioner’s case were completely unrelated, and that Mr. Hedric accordingly was never called upon to advocate a position on behalf of petitioner that was adverse to Fuller or vice versa. The trial court also concluded that there was no adverse effect of Mr. Hedric’s representation of both petitioner and Fuller, insofar as Fuller’s testimony most likely would have corroborated Awantha Shields’ testimony and inculpated petitioner, not exculpated petitioner.
 

 The state court of appeals affirmed the trial court’s decision in this regard. (J.A. Vol. VI, at 2968). Citing
 
 Cuyler v. Sullivan,
 
 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), as the trial court had, the court of appeals concluded:
 

 A review of the record indicates that Fuller and appellant’s cases were completely unrelated. Accordingly, we concur with the trial court’s finding that there was no conflict of interest in He-dric’s representation of Fuller and [appellant]. Furthermore, pursuant to our discussion of appellant’s first claim, even if Hedric had spoken with Fuller, Fuller’s testimony would have inculpated rather than exculpated appellant.
 

 (J.A. Vol. VI, at 2968).
 

 Since petitioner’s claim was adjudicated on the merits by the state courts, this
 
 *MXXXV
 
 Court’s review is confined to whether the state courts’ decision contravened or unreasonably applied clearly established federal law as determined by the United States Supreme Court. Petitioner argues that the state courts’ decisions denying his conflict of interest claim involved an unreasonable application of clearly established Supreme Court precedent. Specifically, petitioner contends that the state courts unreasonably applied the standard set forth in
 
 Cuyler v. Sullivan
 
 by stating in conclusory fashion that no conflict of interest existed because Fuller’s case and petitioner’s case were unrelated. (Petitioner’s traverse, doc.no. 47, at 8).
 

 To prove a claim of ineffective assistance of counsel, criminal defendants typically must demonstrate both that counsel’s performance was so deficient as to fall below prevailing professional norms and that, but for counsel’s deficient performance, there is a reasonable probability that the outcome of the defendant’s trial would have been different.
 
 Strickland v. Washington,
 
 466 U.S. 668, 686-697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Citing its earlier decision in
 
 Cuyler v. Sullivan,
 
 the Court in
 
 Strickland
 
 recognized that prejudice should be presumed for those ineffectiveness claims in which the defendant demonstrates that his attorney labored under an actual conflict of interest that adversely affected the attorney’s performance.
 
 Strickland,
 
 466 U.S. at 692, 104 S.Ct. 2052.
 

 In
 
 Cuyler v. Sullivan,
 
 the United States Supreme Court held that, “In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer’s performance.”
 
 Cuyler,
 
 446 U.S. at 350, 100 S.Ct. 1708. In that case, two retained attorneys represented three co-defendants charged with the murders of a labor official and his companion. Defendant-respondent went to trial first, and was convicted and sentenced to life in prison. His two co-defendants were later acquitted.
 

 Thus, a claim of ineffective assistance of counsel alleging an actual conflict of interest, as defined in
 
 Cuyler,
 
 involves a lessened standard of proof than that typically required to establish a claim of ineffective assistance of counsel under the two-part standard established in
 
 Strickland v. Washington.
 
 The Ohio courts relied on the
 
 Cuyler
 
 decision in rejecting Petitioner Benge’s conflict of interest claim, and petitioner asserts herein that he is entitled to relief based on the state courts’ unreasonable application of the
 
 Cuyler
 
 decision. This Court is not certain, however, that
 
 Cuyler v. Sullivan
 
 represents “clearly established Federal law as determined by the Supreme Court,” within the meaning of 28 U.S.C. § 2254(d)(1).
 

 The Sixth Circuit recently clarified that Cuyler’s lessened standard of proof has never been extended by the United States Supreme Court to any conflict other than joint representation.
 
 Smith v. Hofbauer,
 
 312 F.3d 809, 818 (6th Cir.2002),
 
 cert. denied,
 
 - U.S. -, 124 S.Ct. 441, 157 L.Ed.2d 319 (2003). In that case, the petitioner alleged that his attorney labored under a conflict of interest because, at the time he was representing the petitioner against sexual assault charges, he himself was under criminal indictment in the same county for a felony drug charge. Pointing out that the conflict of interest alleged by Petitioner Smith was not one involving joint representation, the Sixth Circuit explained that petitioner’s claim could not prevail because it did “not rest upon ‘clearly established’ federal precedent.”
 
 Id.
 
 “Petitioner seeks relief on a basis not supported by clearly established federal law inasmuch as the Supreme Court has never applied
 
 Sullivan’s
 
 lessened standard of
 
 *MXXXVI
 
 proof to any conflict other than joint representation.”
 
 Id.
 

 In the instant case, the conflict of interest alleged by petitioner is not one involving joint representation. Although petitioner labeled Fuller a “suspect” and “potential witness for the prosecution,” (Traverse, doc.no. 47, at 8), petitioner and John Fuller were never co-defendants in the same prosecution, and petitioner does not contend otherwise.
 
 (Id.,
 
 at 11). Thus, petitioner is not entitled to the lessened standard of proof set forth in
 
 Cuyler v. Sullivan,
 
 and must instead demonstrate under
 
 Strickland
 
 that defense counsel, due to the alleged conflict of interest on the part of Mr. Hedric, performed deficiently and to petitioner’s prejudice. This the petitioner cannot do.
 

 Awantha Shields testified at trial that she had met Petitioner Benge four or five times through her boyfriend, John Fuller. She testified that he arrived at her home around 4:00 a.m. on February 1, 1993, that he was soaking wet, and that John Fuller was not present at the time. She testified that Petitioner Benge proceeded to tell her that he and his girlfriend had “gotten into it,” and that, after driving down by the Miami River together, he had hit her with a crowbar “no more than ten times.” (J.A. 3510). According to Shields, petitioner said that he did not know whether his girlfriend was dead, but that he proceeded to throw a few rocks over her head and then pushed her into the river. (J.A. 3511). After refreshing her recollection with the witness statement that she had given to Detective Franks, (J.A. 3514), Shields then testified that, when she asked petitioner why he had done this, he said that he had done it for the victim’s Jeanie card. (J.A. 3515). Shields also testified that petitioner said he planned to tell the police, if they questioned him, that “a couple of black guys” had jumped petitioner and his girlfriend. (J.A. 3515).
 

 Awantha Shields confirmed during cross examination that John Fuller was not at home when petitioner arrived there, (J.A. 3524), and testified during re-direct examination that John Fuller arrived at some point while petitioner was still there. (J.A. 3531-32). According to Shields, John Fuller brought with him a newspaper in which Shields found a story apparently confirming what petitioner said he had done. (J.A. 3532). At that point, petitioner was asked to leave the apartment. (J.A. 3528).
 

 Petitioner’s own testimony regarding his contact with Awantha Shields and John Fuller was limited and lacking in details. He testified that he thought to go to John Fuller’s residence for dry clothes and to warm up because it was close. (J.A. 3808). He testified that, after getting clothes from Fuller, he sat around for a while with Fuller and Shields getting high. (J.A. 3808-09). He went on to testify that he was hanging around on a street corner with Fuller, Fuller’s son, and a woman named Racine Wells when he was arrested. (J.A. 3810-11). Petitioner never mentioned whether Fuller was at the apartment when he (petitioner) arrived, or whether there was any point during which petitioner and Shields were alone.
 

 The issue before the Court is whether, by virtue of Mr. Hedric’s representation of both petitioner and John Fuller, defense counsel performed deficiently and to petitioner’s prejudice. Petitioner contends that, but for Mr. Hedric’s conflict of interest, John Fuller would have testified that petitioner and Shields were never alone in the apartment, that he (Fuller) was always present, and that petitioner accordingly could not have told Shields that he had killed Gabbard to get her Jeanie card. John Fuller never shared this information with petitioner’s attorneys, according to petitioner, because Fuller was angry that
 
 *MXXXVII
 
 Mr. Hedric appeared to be devoting all of his attention to petitioner’s case, and none to the drug charges Fuller was facing. The record does not support petitioner’s contentions.
 

 In his witness statement to the police, dated February 22, 1993, John Fuller said that he and Shields were both home on February 1, 1993, when petitioner arrived at their apartment around 4:00 a.m. (J.A. 4423). Fuller also said that petitioner admitted in front of both Fuller and Shields that he had killed his girlfriend by striking her with a jack or crow bar and dumping her body in the river. According to Fuller, petitioner stated that he knew when he and Gabbard argued after she returned from work what he was going to do, and that he planned to tell the police that two black males had robbed them and killed Judy Gabbard. Finally, Fuller said, “I could have missed some of Mike’s conversation when he came to the house as I was asleep and I was trying to get awake when he was telling the story about killing her.” (J.A. 4425). Fuller said that petitioner had mentioned having Gabbard’s Jeanie card, but Fuller also said that, when he asked petitioner whether he had killed Gabbard for money, petitioner did not answer.
 

 In his testimony to the grand jury on March 3, 1993, Fuller indicated that he arrived home on February 1, 1993, around 4:00 a.m. to find petitioner already there. (J.A. 4430). With the exception of whether petitioner admitted to Fuller and Shields, or just Fuller, that he had killed Judy Gabbard, Fuller went on to relate essentially the same details to the grand jury that he had related to Detective Franks in his witness statement.
 
 [2]
 
 (J.A. 4426-4434).
 

 Over three years later, in an affidavit dated August of 1996, Fuller stated that he was home with Shields when petitioner arrived wet and in need of dry clothes. (J.A. 4435). According to Fuller, petitioner admitted to killing Judy Gabbard, but never said anything about doing it for her Jeanie card. (J.A. 4436). Fuller also stated, “I refused to talk about Mike’s (Benge’s) case because I was angry with Hedric for neglecting my case.”
 
 (Id.
 
 at ¶ 12). Finally, Fuller stated that he could not remember what he had said in his grand jury testimony, but that if he had been asked, he would have testified that he was home with Shields when petitioner arrived.
 
 (Id.
 
 at ¶ 13). (Of course, Fuller testified to the grand jury that he was
 
 not
 
 at home when Petitioner Benge arrived.)
 

 Finally, in a deposition conducted on May 6, 1997, Fuller indicated repeatedly that he simply could not remember whether or not he was home with Shields when petitioner arrived on February 1, 1993. (J.A. 4382, 4388). However, Fuller indicated towards the end of his deposition that he could not remember seeing petitioner in wet clothes, and only remembered seeing petitioner once petitioner was wearing some of his (Fuller’s) clothes, thereby suggesting that there were moments when Fuller was not present with Shields and petitioner. (J.A. 4412-13). Fuller further indicated that he “hit the roof’ when he saw that petitioner was wearing one of his (Fuller’s) jackets, and that Fuller never would have allowed Shields to lend that particular jacket to petitioner. (J.A. 4418-19). Thus, Fuller essentially conceded that there must have been conversations between Shields and petitioner to which he (Fuller) was not privy. (J.A. 4419).
 

 
 *MXXXVIII
 
 To prove a claim of ineffective assistance of counsel, petitioner must demonstrate both that counsel performed deficiently and that, but for counsel’s deficient performance, there is a reasonable probability that the outcome of his trial would have been different. To that end, petitioner asserts that defense counsel performed de-ficiently by virtue of Mr. Hedric’s representation of both petitioner and John Fuller, and that petitioner was prejudiced by the conflict of interest insofar as it caused Fuller not to cooperate with Mr. Hedric regarding petitioner’s case.
 

 Petitioner has failed to demonstrate that there was an actual conflict of interest in Mr. Hedric’s representing both petitioner and John Fuller. The state courts found that there was no actual conflict, since petitioner and Fuller were not co-defendants and Mr. Hedric was never required to advocate a position for one that was adverse to the interests of the other. Having reviewed the record and relevant case law, this Court finds nothing unreasonable about the state courts’ conclusion in this regard. Petitioner suggested throughout his traverse that John Fuller was a suspect in the murder of Judy Gab-bard, thereby creating at least a potential conflict of interest for Mr. Hedric. But petitioner has failed to cite, and the Court is not aware of, any evidence in the record suggesting that John Fuller was a suspect in' Ms. Gabbard’s murder.
 
 [3]
 
 In short, with respect to whether the interests of petitioner and John Fuller were at odds sufficient to create an actual conflict of interest for Mr. Hedric, there is simply no evidence in the record suggesting that Mr. Hedric’s duty of loyalty and to zealously represent petitioner was compromised in any way by Mr. Hedric’s representation of John Fuller. Finally, with respect to petitioner’s argument that Mr. Hedric performed defi-ciently in failing to advise Petitioner Benge and the trial court of the alleged conflict of interest, (Traverse, doc.no. 47, at 10), in light of the fact that Mr. Hedric alerted the trial court in John Fuller’s case by filing a motion to withdraw as Mr. Fuller’s attorney, since the record provides little support that a conflict of interest existed, it cannot be said as a matter of constitutional law that Mr. Hedric performed defi-ciently in failing to advise petitioner that he (Hedric) was also representing Fuller.
 

 While petitioner failed to demonstrate an actual conflict of interest, he arguably established the possibility of adverse consequences from Mr. Hedric’s representation of both petitioner and Fuller. It is clear from the record that Fuller refused to talk to Hedric about petitioner’s case because Fuller was angry that Hedric appeared to be more focused on Benge’s case than on Fuller’s case. (J.A. 4436, 4414-15). In other words, defense counsel were able to learn nothing from Fuller regarding Fuller’s knowledge of petitioner’s case solely because of Mr. Hedric’s representation of both petitioner and Fuller.
 

 Whether or not petitioner has demonstrated deficient performance on the part of his attorneys by virtue of Mr. Hedric’s alleged conflict of interest, it tests the limits of credulity to suggest that petitioner actually suffered any adverse effects
 
 *MXXXIX
 
 from Mr. Hedric’s representation of petitioner and Fuller. Even assuming that Mr. Hedric had not represented both, and that Fuller had shared with defense counsel everything he knew about petitioner’s ease, it is far from certain that defense counsel would have learned anything beneficial to petitioner’s case or would have called Fuller to testify. While it is difficult to know for sure what Fuller might have testified to, given the variances between his witness statement, grand jury testimony, 1996 affidavit, and 1997 deposition, it appears that he would have corroborated Shields’ testimony and impugned petitioner. Regardless of whether Fuller was home with Shields when Benge arrived, it is all but certain that there were some conversations between Shields and Benge to which Fuller was not privy. John Fuller admitted in his witness statement that he may have missed some of the conversation between petitioner and Shields because he was asleep, (J.A. 4425); in his grand jury testimony that he was not home when petitioner first arrived at the apartment that he (Fuller) and Shields shared, (J.A. 4430); and in his 1997 deposition that there must have been conversations between petitioner and Shields to which he (Fuller) was not privy, (J.A. 4418-19). Thus, even assuming petitioner could demonstrate deficient performance on the part of defense counsel due to Mr. Hedric’s alleged conflict of interest — a finding the Court has not expressly made, since there was no actual conflict of interest — petitioner cannot demonstrate that he was prejudiced by the alleged deficient performance. Petitioner simply cannot show that, but for Mr. Hedric’s representation of both petitioner and Fuller, there is a reasonable probability that the outcome of petitioner’s trial would have been different.
 

 For the foregoing reasons, the Court finds that petitioner’s third ground for relief is without merit and must be denied.
 

 Fourth Ground for Relief
 
 — Michael
 
 Benge was denied the right to a fair trial, due process of law, and a reliable sentencing determination because the jury and trial court weighed a non-statutory aggravating factor
 

 In his petition, petitioner explains that state’s exhibit 1 was a photograph of Petitioner Benge taken shortly after his arrest. In that photo, petitioner was wearing clothes that belonged to John Fuller, not petitioner, including a cap that said, “No more Mr. Nice Guy.” Petitioner complains that the prosecution, in spite of knowing that the clothes did not belong to petitioner, emphasized that hat in closing arguments at the penalty phase of the trial to divert the jury’s attention from the single aggravating circumstance and from legitimate mitigating evidence. (Petition, doc. no. 15, at ¶ 27).
 

 In his traverse, petitioner expressly withdraws this claim, stating, “After careful review of this claim, counsel have determined that it is not sufficiently compelling on its own to warrant the writ of habeas corpus.” (Traverse, doc.no. 47, at 15). Petitioner chooses instead to discuss these allegations in the context of his ninth ground for relief,
 
 i.e.,
 
 prosecutorial misconduct during the culpability and penalty phases of the trial.
 

 Accordingly, petitioner’s fourth ground for relief, as set forth in the habeas corpus petition, will be denied. The Court will consider the allegations supporting ground four when it considers petitioner’s ninth ground for relief.
 

 Fifth Ground for Relief
 
 — Michael
 
 Benge was denied the right to a fair trial, due process of law, and a reliable sentencing determination because the State introduced insufficient evidence of aggravated robbery
 

 Petitioner argues in his fifth ground for relief that there was insufficient evidence
 
 *MXL
 
 to support the crime of aggravated robbery. Petitioner was charged in count one with aggravated felony murder under R.C. § 2903.01(B), charging that he had purposely caused the death of Judith Gabbard while committing or attempting to commit aggravated robbery.
 
 [4]
 
 Petitioner was charged in count two with aggravated robbery. Petitioner argues that his conviction for aggravated robbery should be vacated, and that his death sentence should be vacated as well, since aggravated robbery was an essential element of the offense of the felony aggravated murder offense for which petitioner was convicted and sentenced to death.
 

 Petitioner argues that the state failed to prove either that he stole Judy Gabbard’s ATM card, or that he intended to kill her for the purpose of stealing her ATM card. According to petitioner,
 

 The State introduced precisely four references in support of the charge. It elicited testimony that Mr. Benge was in possession of the bank card at the time of his arrest. J.A. 3537. It established that two withdrawals were made after Judy’s death. J.A. 3659. The State also established that Judy’s jacket, which had been floating in the river, had one of its pockets turned inside out. J.A. 3690. It elicited the absurd and unbelievable testimony from Awantha Shields that she invited Mr. Benge, whom she did not know well, into her home at 4:00 a.m., that Mr. Benge was soaking wet, and that he casually announced that he killed his girlfriend for her Jeanie card. J.A. 3515. These four points were the extent of the State’s evidence in support of the aggravated murder charge.
 

 (Petitioner’s traverse, doc.no. 47, at 19). Petitioner argues that this weak evidence was further undermined by his own testimony that he and Judy shared his checking account and that he had permission to use Judy’s ATM card. Petitioner further argues that, according to the coroner, personal items recovered from Judy’s body included jewelry, a checkbook, and cash, thereby undermining the state’s assertion that petitioner had killed her to rob her. Petitioner maintains that the State failed to prove either that he stole the ATM card or that he intended to kill Judith Gabbard for the purpose of stealing her ATM card, and that the State accordingly failed to prove beyond a reasonable doubt the essential elements of the felony aggravated murder count, the attached death penalty specification, or the aggravated robbery charge.
 

 Petitioner’s claim was considered and rejected by the Supreme Court of Ohio on direct appeal. Citing
 
 State v. Eley,
 
 56 Ohio St.2d 169, 383 N.E.2d 132, syllabus (1978), the Supreme Court noted that “ ‘[a] reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt.’ ” The Supreme Court proceeded to recount the same evidence cited by petitioner — namely, the testimony of Awantha Shields’ regarding petitioner’s admission that he had killed Gabbard for her “Jeanie” card, the fact that petitioner dropped the ATM card when the police approached him, and the fact that one of Gabbard’s coat pockets was turned inside out.
 
 Benge, supra,
 
 75 Ohio St.3d at 142-42, 661
 
 *MXLI
 
 N.E.2d 1019. The Supreme Court also pointed out that petitioner had recently lost his job and was in need of money to support his drug habit.
 
 Id.
 
 at 143, 661 N.E.2d 1019. The Supreme Court concluded by noting, “The fact that appellant presented his own version of events in order to support his claim that he had permission to use the ATM card simply brings the credibility of witnesses into play. However, this court will not ‘substitute [its] evaluation of witness credibility for the jury’s.’ ”
 
 Benge,
 
 75 Ohio St.3d at 143, 661 N.E.2d 1019 (quoting
 
 State v. Waddy,
 
 63 Ohio St.3d 424, 430, 588 N.E.2d 819 (1992)).
 

 Petitioner argues in the instant action that the state courts failed to apply or even discuss federal constitutional principles in rejecting his claim, and that the state courts’ decision accordingly did not constitute an “adjudication on the merits” sufficient to invoke the deferential standard of review set forth in 28 U.S.C. § 2254(d)(1). Petitioner argues in the alternative that the state opinions unreasonably applied clearly established Federal law, insofar as they did not acknowledge or apply the controlling cases from the United States Supreme Court,
 
 ie., Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and
 
 In re Winship,
 
 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Petitioner urges the Court to review his claim de novo.
 

 The lack of a specific reference to the federal constitution or interpretive case law does not mean that the state courts failed to adjudicate the merits of a claim. The United States Supreme Court recently held that a state court need not cite to, nor even be aware of, clearly established Supreme Court precedents, “so long as neither the reasoning nor the result of the state-court decision contradicts them.”
 
 Esparza v. Mitchell,
 
 — U.S. -, -, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) (internal quotation marks and citation omitted).
 

 In reviewing the sufficiency of the evidence claim presented by Petitioner Benge, the Ohio Supreme Court followed the standard set forth in
 
 State v. Eley, supra,
 
 stating that “[a] reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the elements of the offense have been proven beyond a reasonable doubt.”
 
 Benge,
 
 75 Ohio St.3d at 142, 661 N.E.2d 1019 (quoting
 
 Eley, supra,
 
 56 Ohio St.2d at syllabus). Having reviewed countless state court decisions generally discussing sufficiency of the evidence claims, this Court has found that the state standard in
 
 State v. Eley,
 
 and federal standard in
 
 Jackson v. Virginia,
 
 are frequently cited in tandem and arguably present the same test for sufficiency of the evidence to support a conviction.
 
 See, e.g., State v. Loza,
 
 71 Ohio St.3d 61, 68-69, 641 N.E.2d 1082 (1994). To the extent that the Ohio Supreme Court applied a more exacting standard for petitioner to satisfy than that set forth in
 
 Jackson v. Virginia
 
 — a finding this Court has not made — it would appear that the Ohio Supreme Court’s decision was contrary to clearly established Federal law, necessitating de novo review by this Court.
 
 See Magana v. Hofbauer,
 
 263 F.3d at 542, 550 (6th Cir.2001)(discussing
 
 Williams v. Taylor, supra,
 
 529 U.S.at 405-406, 120 S.Ct. 1495). That said, the Court’s resolution of petitioner’s claim would be exactly the same, whether it reviewed the claim de novo or whether it endeavored to determine whether the Ohio Supreme Court’s decision contravened or unreasonably applied clearly established United States Supreme Court precedent.
 
 [5]
 

 
 *MXLII
 
 Sufficiency of the evidence questions are governed by the United States Supreme Court’s decision in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When a state prisoner challenges the sufficiency of evidence, a federal habeas corpus court must consider whether there was sufficient evidence introduced at trial to allow a rational trier of fact to find guilt beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). To determine whether the evidence was sufficient to support a conviction as a matter of due process, this Court must consider the evidence in the light most favorable to the prosecution.
 
 Jackson,
 
 443 U.S. at 319, 99 S.Ct. 2781. The prosecution is not affirmatively required to “rule out every hypothesis except that of guilt.”
 
 Id.
 
 at 326, 99 S.Ct. 2781;
 
 see also United States v. Beddow,
 
 957 F.2d 1330, 1334 (6th Cir.1992). A reviewing court “faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.”
 
 Id.; see also Jamison v. Collins,
 
 100 F.Supp.2d 647, 705 (S.D.Ohio 2000)(“A conviction may rest on circumstantial evidence, and a federal habeas corpus court need not rule out all possible interpretations of the circumstantial evidence.”),
 
 aff'd,
 
 291 F.3d 380 (6th Cir.2002). This Court does not substitute its opinion as to the weight of the evidence or the credibility of witnesses.
 
 See United States v. Jackson,
 
 55 F.3d 1219, 1225 (6th Cir.),
 
 cert. denied,
 
 516 U.S. 926, 116 S.Ct. 328, 133 L.Ed.2d 229 (1995);
 
 Neal v. Morris,
 
 972 F.2d 675, 679 (6th Cir.1992). “The trier of fact at the state court level alone bears the responsibility to choose which testimony or evidence to believe.”
 
 Jamison v. Collins,
 
 100 F.Supp.2d at 705. A sufficiency of evidence review, for purposes of federal habeas relief, does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather on whether it made a rational decision to convict or acquit.
 
 Herrera v. Collins,
 
 506 U.S. 390, 402, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (clarifying
 
 Jackson,
 
 443 U.S. 307, 99 S.Ct. 2781).
 

 Under clearly established Federal law,
 
 i.e., Jackson v. Virginia, supra,
 
 petitioner’s claim that there was insufficient evidence to support aggravated robbery must fail. Section 2911.01(A) of the Ohio Revised Code provides:
 

 No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after such attempt or offense, shall do either of the following:
 

 (1) Have a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code, on or about his person or under his control;
 

 (2) Inflict or attempt to inflict serious physical harm on another.
 

 As to “theft offense,” R.C. § 2913.02 provides:
 

 No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 

 (1) Without the consent of the owner or person authorized to give consent;
 

 (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
 

 (3) By deception;
 

 (4) By threat.
 

 Through the testimony of Awantha Shields, the prosecution introduced evidence that petitioner, by his own admission, killed Judith Gabbard for her ATM card. The prosecution also introduced evidence that petitioner was in possession of Judith Gabbard’s ATM card, that the card was used twice after her death, and that petitioner tossed it to the ground as police
 
 *MXLIII
 
 approached to arrest him. Finally, the prosecution introduced evidence that a pocket on Gabbard’s coat, which was found floating in the river, was turned inside out. Petitioner’s own testimony established that he was out of work and, in conjunction with other testimony, implied he was in need of money to support his drug habit.
 

 Petitioner would have this Court dismiss Shields’ testimony as “absurd and unbelievable,” (Petitioner’s traverse, doc.no. 47, at 19), and believe over her testimony his own testimony that he had permission to use Gabbard’s ATM card and that he and Gabbard also shared his checking account and were generally partners in finance matters. But as the Court noted above, questions as to the credibility of witnesses are beyond the scope of habeas corpus review of sufficiency of the evidence questions.
 
 See United States v. Jackson, supra,
 
 55 F.3d at 1225;
 
 Jamison v. Collins, supra.,
 
 100 F.Supp.2d at 705. “The trier of fact at the state court level alone bears the responsibility to choose which testimony or evidence to believe.”
 
 Jamison,
 
 100 F.Supp.2d at 705. The jury in this case obviously believed Shields’ testimony, and this Court will not substitute its judgment for the jury’s.
 

 Petitioner also argues that the fact that Gabbard’s body was recovered with such personal items as jewelry, cash, and a checkbook undermines the state’s theory that he robbed her. As the Court noted above, however, the Supreme Court made clear in
 
 Jackson v. Virginia
 
 that the prosecution is not affirmatively required to “rule out every hypothesis except that of guilt.”
 
 Jackson,
 
 443 U.S. at 326, 99 S.Ct. 2781;
 
 see also United States v. Beddow, supra,
 
 957 F.2d at 1334. According to
 
 Jackson,
 
 a reviewing court “faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.”
 
 Jackson,
 
 443 U.S. at 326, 99 S.Ct. 2781.
 

 In sum, the state did not merely hypothesize that petitioner killed Gabbard for the purpose of obtaining her ATM card. Nor did the state support the theory that petitioner killed Gabbard for the purpose of obtaining her ATM card by offering evidence that was palpably unbelievable or invalid on its face. Rather, the state offered tangible evidence that would permit a rational trier of fact to find that petitioner killed Gabbard for the purpose of obtaining her ATM card. That the state’s case pitted the credibility of its witnesses and quality of its evidence against the credibility of petitioner’s own testimony does not render the evidence constitutionally insufficient to sustain a conviction. This Court is bound by the credibility determinations made by the trial jury, and will not substitute its judgment for theirs. For the foregoing reasons, the Court finds that petitioner’s fifth ground for relief is without merit and must be denied.
 

 Sixth Ground for Relief
 
 — Michael
 
 Benge was denied the right to a fair trial, due process of law, and a reliable sentencing determination because the jury was not discharged following inflammatory and prejudicial outbursts by the victim’s family both inside and outside of the courtroom
 

 In his sixth claim, petitioner contends that he was denied a fair trial as a result of inflammatory and prejudicial outbursts by the victim’s family both inside and outside of the courtroom. His trial counsel moved on three separate occasions for a mistrial, all of which motions were denied by the trial court.
 

 Initially, petitioner contends that the Supreme Court of Ohio failed to apply federal constitutional principles to this claim. Petitioner further asserts that the Ohio courts therefore failed to “adjudicate the merits” as that term is used in the AED-
 
 *MXLIV
 
 PA. 28 U.S.C. § 2254(d). A claim which was not adjudicated on the merits is entitled to
 
 de novo
 
 review by this Court.
 

 Petitioner is technically correct that the Ohio Supreme Court did not apply federal constitutional principles or cases with regard to these claims. The Ohio Supreme Court did, however, review the circumstances upon which petitioner’s motions for mistrial were made, and concluded that the decision of the trial court in denying the motions was not erroneous.
 
 State v. Petitioner,
 
 75 Ohio St.3d at 143, 144, 661 N.E.2d 1019. The Ohio Supreme Court noted that, absent clear evidence in the record that the jury was improperly influenced by the conduct in question, the trial judge was in the best position to evaluate such circumstances and was owed substantial deference. The Ohio Supreme Court noted that the trial court questioned the jurors and concluded that the outbursts had not prejudiced the panel.
 
 Id.
 
 In this Court’s view, the lack of specific reference to the federal constitution or interpretive case law does not mean that state courts failed to adjudicate the merits of this claim. The United States Supreme Court recently held that a state court need not cite to, nor even be aware of, clearly established Supreme Court precedents, “so long as neither the reasoning nor the result of the state-court decision contradicts them.”
 
 Mitchell v. Esparza,
 
 — U.S. -, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) (internal quotation marks and citation omitted).
 

 Regardless of the standard of review applicable to this issue, this Court is convinced that the decision of the trial court was consistent with the United States Constitution. The facts at issue in this claim consist of three separate incidents, after each of which petitioner’s counsel moved for a mistrial.
 

 During the testimony of Detective Nugent, petitioner’s counsel moved at sidebar for a mistrial. He contended that a member of the victim’s family “stormed out of the courtroom and was crying rather loudly.” (J.A. 3620). The trial court viewed this description as “a mischaracter-ization of what happened.”
 
 Id.
 
 The judge acknowledged that the family member became upset and left the courtroom, but denied that she stormed out. The judge also offered to admonish the jury. Petitioner’s counsel, however, requested that the jury not receive any additional instruction. Consequently, the court did not comment upon or otherwise admonish the jury regarding this incident.
 

 There is nothing in the record indicating that the victim’s family member disrupted the trial or caused prejudice to the petitioner. The trial necessarily involved testimony describing the brutal death of Judith Gabbard, a matter which was not in dispute. The fact that a family member became upset during testimony describing the circumstances of her death would not necessarily prejudice a jury, since petitioner himself testified that, in a rage, he bludgeoned the victim to death. The Constitution requires that a defendant be given “a fair trial by a panel of impartial, indifferent jurors.”
 
 Irvin v. Dowd,
 
 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (internal quotations omitted). With regard to this particular incident, the record below gives no indication that the incident caused the jurors to be anything other than impartial or indifferent.
 

 Not long thereafter, during a break in the trial for lunch, the son of the victim attempted to assault petitioner as he was taken from the courthouse. Deputies prevented the assault which nonetheless resulted in screaming which was heard by at least one juror. No juror actually witnessed the incident.
 

 Petitioner’s counsel again moved for a mistrial. Without the jury in the courtroom, the trial court discussed with counsel its intention of meeting on the record
 
 *MXLV
 
 with the jury, in the absence of counsel. The Court further indicated that it would question the jurors to determine the extent of their knowledge concerning the incident and if such knowledge would interfere with their ability to serve as fair and impartial jurors. Petitioner’s counsel expressly indicated that he agreed with the procedure. (J.A. 380).
 

 The court thereafter met with the jurors and learned that only one had any knowledge of the incident. The juror in question was an alternate who was discharged at the conclusion of the trial. This juror testified that he heard yelling and screaming, but did not witness the cause of the commotion. Thereafter, he did see the petitioner with a deputy. The court expressly asked the juror if what he observed would “interfere in any manner, shape or form with your ability to be fair and impartial.” (J.A. 382). The juror stated that it would not.
 

 The trial court specifically questioned the jurors as to their knowledge of the incident. The only juror who had any awareness of the matter expressly indicated that his ability to be fair and impartial had not been impaired. Further, this juror had no knowledge of the incident, apparently did not know the identity of the aggressor, and otherwise indicated that his impartiality was unaffected. Based upon this record, this Court finds no constitutional error in the trial court’s denial of petitioner’s motion for a mistrial.
 

 Later in the trial, petitioner’s counsel again moved for a mistrial. During a sidebar conference, his counsel brought to the court’s attention that a juror had mentioned to the court’s bailiff some concern about the precautions that were being taken as jurors came in and out of the courthouse. The trial court noted that the courthouse was constructed in the 1880’s and was not designed with modern day security issues in mind. He offered to again inquire of the jurors to determine if any of them had such concerns as to prevent them from being fair and impartial in their consideration of the ease. Petitioner’s counsel opposed any further questioning by the court. Consequently, the court declined any further questioning of the jury. The trial court noted that the juror in question had raised no specific incidents or circumstances but was simply inquiring as to a better way for jurors to enter and leave the courtroom.
 

 Again, the record below contains no evidence to indicate an “atmosphere in and around the courtroom ... so hostile as to interfere with the trial process ...”
 
 Estes v. Texas,
 
 381 U.S. 532, 561, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Warren, C.J., concurring). While the trial court offered to inquire further as to issue raised by a juror, petitioner’s counsel opposed any additional interrogation. The record in this case does not demonstrate that the trial court’s denial of petitioner’s motion for a mistrial on these grounds violated the United States Constitution.
 

 For these reasons, the Court finds no merit to the sixth ground for relief raised by the petitioner because the Ohio State Supreme Court’s decision rejecting this claim did not contravene clearly established United States Supreme Court precedent.
 

 Seventh Ground for Relief
 
 — Michael
 
 Benge’s death sentence is unconstitutional because Ohio’s appellate review process fails to adequately guard against arbitrary and disproportionate punishments
 

 Petitioner argued in his habeas corpus petition that the appellate court and Supreme Court of Ohio refused to consider evidence demonstrating the disproportion-ality of petitioner’s death sentence. Specifically, petitioner sought to introduce evidence of other felony aggravated murder/aggravated robbery cases in which death was sought and imposed, in which
 
 *MXLVI
 
 death was sought but not imposed, and in which death could have been sought but was not. (Petition, doc.no. 14, at ¶¶ 52-58).
 

 In his traverse, however, counsel for petitioner explains that he would rather have these allegations considered in conjunction with his sixteenth ground for relief, wherein he presents a systemic challenge to the constitutionality of Ohio’s death penalty scheme. (Traverse, doc.no. 47, at 28). The Court will accordingly consider these allegations when it considers petitioner’s sixteenth ground for relief.
 

 Eighth Ground for Relief
 
 — Michael
 
 Benge’s death sentence is unconstitutional because Ohio’s appellate review process fails to adequately guard against arbitrary and disproportionate punishments
 

 Petitioner argues in his habeas corpus petition that the state appellate court and Supreme Court of Ohio, in conducting their independent assessment of the appropriateness of petitioner’s death sentence, considered non-statutory aggravated circumstances and failed to consider and give effect to relevant mitigating evidence. (Petition, doc.no. 14, at ¶¶ 59-68). In his traverse, however, counsel for petitioner explains that he would rather have these allegations considered in conjunction with his sixteenth ground for relief, wherein he presents a systemic challenge to the constitutionality of Ohio’s death penalty scheme. (Traverse, doc.no. 47, at 29). The Court will accordingly consider these allegations when it considers petitioner’s sixteenth ground for relief.
 

 Ninth Ground for Relief
 
 — Prosecutorial
 
 misconduct at the culpability and penalty phases of Michael Benge’s capital trial denied him the right to a fair trial and due process of law in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution
 

 In his ninth ground for relief, petitioner raises several instances of prosecutorial misconduct. (Petition, doc.no. 14, at ¶¶ 69-83). In its
 
 Opinion and Order
 
 of March 31, 2000, the Court determined that all but two of petitioner’s allegations were procedurally barred. (Doc.No.40). Properly before the Court for consideration are petitioner’s allegations that the prosecution made denigrating remarks about defense counsel and that the prosecution introduced an irrelevant, inflammatory photograph depicting petitioner wearing a hat that said “No More Mr. Nice Guy.”
 

 Regarding the first allegation, petitioner argues that the prosecution made denigrating remarks about defense counsel during defense counsel’s cross examination of a prosecution witness. (Traverse, doc. no. 47, at 39-41). While defense counsel was cross examining Detective Nugent, the prosecution objected and remarked, “[cjross examination doesn’t mean you can get away with murder.” (J.A. 3679). Petitioner argues that prosecutors are not permitted to denigrate defense counsel or otherwise impugn a defendant’s right to present a vigorous defense. Petitioner argues that the comment was not isolated, and that the pattern of misconduct continued into the penalty phase, when the prosecution remarked several times that defense counsel “had a job to do” and when the prosecution suggested that defense counsel were morally unsound for putting petitioner’s daughter on the stand to plead for her father’s life.
 

 Petitioner’s second allegation, (originally set forth in his fourth claim for relief), accuses the prosecutor of misconduct for introducing and repeatedly referring to a photograph of petitioner wearing a hat that said, “No more Mr. Nice Guy.” (Petition, doc.no. 14, at ¶¶ 24-31). At trial, state’s exhibit 1 was a photograph of Peti
 
 *MXLVII
 
 tioner Benge taken shortly after his arrest. Awantha Shields identified Petitioner Benge in the photograph and testified that he was wearing her husband’s (John Fuller’s) clothes. Petitioner complains that the prosecution, knowing full well that the clothes did not belong to petitioner, introduced the photograph to make petitioner look like a hoodlum and emphasized the hat in closing arguments at the penalty phase of the trial to inflame the jury and divert the jury’s attention from the single aggravating circumstance and from legitimate mitigating evidence. (Petition, doc. no. 14, at ¶¶ 26-27).
 

 Both allegations of prosecutorial misconduct were considered and rejected by the Supreme Court of Ohio on direct appeal. The Ohio Supreme Court held that the state’s reference to the “No more Mr. Nice Guy” slogan on the hat petitioner was wearing in state’s exhibit 1 did not warrant reversal. The court explained, “The photo of appellant wearing this cap was identified at trial as depicting how appellant was dressed the morning the victim was killed.”
 
 Benge,
 
 75 Ohio St.3d at 141, 661 N.E.2d 1019. With respect to petitioner’s claim that the prosecution denigrated defense counsel with the comment, “Cross examination doesn’t mean you can get away with murder,” the Ohio Supreme Court concluded, “Although this comment was certainly uncalled for and cannot be condoned, we do not believe that it deprived appellant of a fair trial.”
 
 Benge,
 
 75 Ohio St.3d at 142, 661 N.E.2d 1019 (citing
 
 State v. Keenan,
 
 66 Ohio St.3d 402, 406-407, 613 N.E.2d 203 (1993)).
 

 Petitioner argues that the Ohio Supreme Court failed to apply clearly established Supreme Court precedent. Specifically, petitioner argues that the state court applied an outcome-determinative test, asking only whether petitioner would have been convicted without the errors, instead of the test required by clearly established Federal law,
 
 ie., Darden v. Wainwright, 477
 
 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), asking whether the errors deprived petitioner of a fair trial in violation of his right to due process. Petitioner argues that, in the Sixth Circuit, the determination of whether prosecutorial misconduct resulted in the denial of a fair trial requires the reviewing court to determine if the prosecutorial conduct was improper and, if so: (1) whether the statements were misleading or otherwise prejudicial to the defendant; (2) whether the prosecutor’s actions were isolated or part of pattern; (3) whether the prosecutor’s remarks were deliberate; and (4) the total strength of the evidence against the defendant.
 
 [6]
 

 The Ohio Supreme Court’s decision in this case rejected petitioner’s denigration-of-defense-counsel allegation because the prosecutor’s conduct did not deprive petitioner of a fair trial.
 
 Benge,
 
 75 Ohio St.3d at 142, 661 N.E.2d 1019 (“we do not believe that it deprived appellant of a fair trial.”). Moreover, the Ohio Supreme Court cited
 
 State v. Keenan,
 
 66 Ohio St.3d 402, 406-407, 613 N.E.2d 203 (1993), a decision that cited and applied the fair trial standard set forth in
 
 Donnelly v. DeChristoforo
 
 and
 
 Darden v. Wainwright.
 
 However, the Ohio Supreme Court’s decision rejected petitioner’s “No more Mr. Nice Guy” allegation because it “did not warrant reversal.”
 
 Benge,
 
 75 Ohio St.3d at 141, 661 N.E.2d 1019. That being so, it would appear that this Court is required to review the former allegation to determine whether the state court’s decision contravened
 
 *MXLVIII
 
 or unreasonably applied clearly established Federal law, and the latter allegation de novo.
 

 Under clearly established Federal law, as determined by the Supreme Court, “the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.”
 
 Smith v. Phillips,
 
 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). To that end, a reviewing court faced with allegations of prosecu-torial misconduct must determine whether the prosecutorial misconduct at issue “ ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ ”
 
 Darden v. Wainwright,
 
 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)(quoting
 
 Donnelly v. DeChristoforo,
 
 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). In
 
 Donnelly,
 
 the Supreme Court concluded that the defendant had not been deprived of fundamental fairness after considering that the comments at issue gave rise to conflicting inferences, that the trial court took pains to remedy the comments at issue, and that the challenged comments were “but one moment” in a long trial.
 
 Donnelly,
 
 416 U.S. at 644-45, 94 S.Ct. 1868. Similarly, the Supreme Court in
 
 Darden
 
 noted, in addition to the fact that the weight of the evidence against the defendant was heavy, that the prosecutorial comments at issue did not manipulate or misstate the evidence, did not implicate other specific rights, were largely invited by defense counsel’s closing summation, and were mitigated in part by defense counsel’s response.
 
 Darden,
 
 477 U.S. at 182-83, 106 S.Ct. 2464. The Sixth Circuit has formulated the following approach for determining whether impermissible prosecutorial comments resulted in a fundamentally unfair trial within the meaning of
 
 Donnelly:
 

 In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused.
 

 Hill v. Brigano,
 
 199 F.3d 833, 847 (6th Cir.1999)(quoting
 
 Angel v. Overberg,
 
 682 F.2d 605, 608 (6th Cir.1982)).
 

 The Court will turn first to petitioner’s claim that the prosecution denigrated defense counsel. The relevant facts are as follows. During cross-examination of prosecution witness Detective Nugent, defense counsel asked Detective Nugent whether police had recovered any evidence demonstrating that the “tire tool” in evidence was in fact the instrument that caused the death of Judith Gabbard. The prosecution objected, insisting that it was not an appropriate time for defense counsel to argue the evidence.
 

 MR. HOWARD [on behalf of petitioner]: I am just asking the question, Judge. It’s Cross-Examination.
 

 MR. PIPER, III [on behalf of state]: Well, Cross-Examination doesn’t mean that you can get away with murder.
 

 MR. HOWARD: Well, I am going to object and ask that editorial comment—
 

 (J.A. 3679). Thereafter, the trial judge called for a recess and dismissed the jury for fifteen minutes. The trial court admonished counsel, outside of the presence of the jury, to focus on the issues and stop “sniping” at each other. (J.A. 3680). The trial court went on to say that it did not see anything wrong with defense counsel’s line of questioning. (J.A. 3681). Thereafter, the trial resumed, though the trial court gave no curative instruction. The remainder of the cross-examination and redirect-examination of Detective Nugent took place without any further incidents.
 

 
 *MXLIX
 
 Applying clearly established Federal law to petitioner’s claim that the prosecution denigrated defense counsel, the Court cannot find that petitioner suffered a fundamentally unfair trial sufficient to cast aside the Ohio State Supreme Court’s decision and grant habeas corpus relief. As a preliminary matter, it is fair to characterize the prosecutor’s remark as improper. The Ohio Supreme Court noted that the remark was “uncalled for,” and this Court would not disagree. The Court notes that the trial court did not give a curative instruction or otherwise take steps to mitigate any possible adverse effects of the prosecutor’s remark, though the jury was reminded on numerous occasions — often by the attorneys themselves — that their comments and arguments were not evidence.
 
 [7]
 
 But this particular comment was isolated and in passing.
 
 [8]
 
 The trial court immediately recessed the proceedings and, out of the presence of the jury, admonished both attorneys in an effort to diffuse the situation before it escalated any further. The remainder of the cross-examination and redirect examination of Detective Nugent took place without incident. The prosecution’s comment did not misstate or misrepresent evidence, and did not implicate any specific rights enumerated in the Bill of Rights.
 

 Finally, the Court is satisfied that the weight of the evidence against petitioner was substantial, though the Court is mindful that the weight of the evidence against the accused is just one of many factors to consider in determining the overall fairness of his trial.
 
 See Hill v. Brigano,
 
 199 F.3d 833, 847 (6th Cir.1999)(holding that strength of competent proof to establish guilt is one of four factors to consider when determining, in response to allegation of prosecutorial misconduct, overall fairness of trial),
 
 cert. denied,
 
 529 U.S. 1134, 120 S.Ct. 2015, 146 L.Ed.2d 964 (2000). This Court has repeatedly found, both in connection with its procedural default rulings and as to the merits of other grounds for relief, that there was more than enough evidence establishing petitioner’s guilt on the charges of aggravated murder and aggravated robbery. (See
 
 Opinion and Order
 
 of March 31, 2000, doc.no. 40; discussion of first ground for relief,
 
 supra;
 
 discussion of fifth ground for relief, supra).
 

 The Supreme Court of Ohio rejected petitioner’s allegation that the prosecution denigrated defense counsel with the statement, “Cross-examination doesn’t mean you can get away with murder,” because, in the Court’s view, petitioner was not deprived of a fair trial. Having reviewed the record and clearly established Federal
 
 *ML
 
 law, this Court cannot find that the Ohio Supreme Court’s decision contravened or unreasonably applied United States Supreme Court precedent.
 

 Turning to petitioner’s allegation that the prosecution committed misconduct by introducing into evidence and emphasizing a photograph of petitioner, taken shortly after his arrest, depicting him with a hat on that said “No more Mr. Nice Guy,” this Court notes that the Ohio Supreme Court concluded that the allegation did not warrant reversal.
 
 Benge,
 
 75 Ohio St.3d at 141, 661 N.E.2d 1019. “The photo of appellant wearing this cap was identified at trial as depicting how appellant was dressed the morning the victim was killed.”
 
 Id.
 

 Without clarification about whether the hat even belonged to petitioner, the remark could fairly be characterized as underhanded. The trial court gave no curative instruction in this instance, but the absence of such an instruction could be attributed to the fact that introduction of the photograph and reference to the slogan were so isolated and fairly benign. Further, the jury heard testimony that the clothing worn by the petitioner was given to him by Shields and was actually clothing belong to Fuller. To this extent, the jury could view the prosecutor’s comments as inconsistent with unrefuted testimony. In light of the passing nature of the reference, as well as the weight of the evidence against petitioner, under no view of the record can this Court conclude that the introduction of the photograph or reference to the slogan deprived petitioner of a fundamentally fair trial.
 

 For the foregoing reasons, the Court concludes that petitioner’s ninth claim for relief is without merit and must be denied.
 

 Tenth Ground for Relief
 
 — Prosecutorial
 
 misconduct in the penalty phase of Benge’s capital trial denied him the right to a fair trial and due process of law in violation of the Sixth and Fourteenth Amendments to the United States Constitution
 

 Petitioner argues in his tenth claim for relief that the prosecutor committed numerous instances of misconduct during the penalty phase closing arguments. (Petition, doc.no. 14, at ¶¶ 84-107). Specifically, petitioner contends that the prosecution invited the jurors to stray from the carefully structured process by which they were required to decide whether to impose the death penalty by urging them to consider non-statutory aggravating circumstances, mischaracterizing the weighing process, appealing to their emotions and inciting their passions, trivializing the mitigation evidence presented by petitioner, and maligning defense counsel.
 

 Petitioner raised these allegations of prosecutorial misconduct on direct appeal. Noting that trial counsel had failed to object to all but one of the allegations, the Supreme Court of Ohio concluded that no plain error occurred. Specifically, the court acknowledged that prosecutors are entitled to a certain degree of latitude in closing argument, that it falls within the sound discretion of the trial court to determine the propriety of a prosecutor’s remarks, and that “[a] conviction will be reversed only where it is clear beyond a reasonable doubt that, absent the prosecutor’s comments, the jury would not have found appellant guilty.”
 
 Benge,
 
 75 Ohio St.3d at 141, 661 N.E.2d 1019. Ultimately, the Ohio Supreme Court concluded that, “[d]espite any alleged impropriety by the prosecutor, we believe that the jury would have convicted him absent these comments; thus, we reject appellant’s arguments.”
 
 Id.
 
 at 141, 661 N.E.2d 1019.
 

 
 *MLI
 
 As with his ninth claim for relief, petitioner urges the Court to review his claim de novo, arguing that the Ohio Supreme Court ignored clearly established Federal law in rejecting his allegations. Petitioner argues that the Ohio Supreme Court, by using an outcome-determinative test instead of undertaking a determination of whether petitioner’s penalty phase was rendered fundamentally unfair by the prosecutor’s closing argument, failed to apply controlling Federal law.
 
 See Darden v. Wainwright, supra,
 
 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144. As noted above, petitioner argues that, in the Sixth Circuit, the determination of whether pros-ecutorial misconduct resulted in the denial of a fair trial requires the reviewing court to determine if the prosecutorial conduct was improper and, if so: (1) whether the statements were misleading or otherwise prejudicial to the defendant; (2) whether the prosecutor’s actions were isolated or part of pattern; (3) whether the prosecutor’s remarks were deliberate; and (4) the total strength of the evidence against the defendant.
 
 [9]
 

 It is clear that petitioner’s allegations of prosecutorial misconduct during penalty phase closing argument were rejected by the Supreme Court of Ohio on grounds that the outcome of petitioner’s sentencing hearing would have been the same absent the challenged remarks. It is also clear, however, that the Ohio Supreme Court undertook this outcome-determinative review of petitioner’s allegations because those allegations had not been objected to at trial. Under Ohio law, plain error review is outcome-determinative review.
 
 State v. Long,
 
 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978)(plain error does not exist “unless, but for the error, the outcome of the trial clearly would have been otherwise.”). Thus, petitioner’s accusation that the Ohio Supreme Court ignored clearly established Federal law by applying to petitioner’s allegations an outcome-determinative test instead of a fundamental fairness test is somewhat disingenuous. In any event, it is immaterial whether this Court reviews petitioner’s claim de novo or under the constraints of § 2254(d)(1); the claim is without merit under either approach.
 

 As the Court stated in its discussion of petitioner’s ninth ground for relief, “To grant habeas relief based on prosecu-torial misconduct that does not violate a specific guarantee under the Bill of Rights, the misconduct must be so egregious as to deny the petitioner due process.”
 
 Lorraine v. Coyle,
 
 291 F.3d 416, 439 (6th Cir.2002)(quoting
 
 Donnelly v. DeChristoforo, supra,
 
 416 U.S. at 643-45, 94 S.Ct. 1868),
 
 Opinion Corrected on Denial of Rehearing,
 
 307 F.3d 459 (6th Cir.2002),
 
 cert. denied,
 
 538 U.S. 947, 123 S.Ct. 1621, 155 L.Ed.2d 489 (2003). Determining whether petitioner was denied fundamental fairness by improper prosecutorial argument requires the Court to examine a multitude of factors, including the degree to which the remarks had a tendency to mislead the jurors and prejudice the petitioner, whether the remarks were isolated or extensive, whether the remarks were deliberate or inadvertent, and the strength of competent evidence supporting the petitioner’s conviction.
 
 See DePew v. Anderson,
 
 311 F.3d 742, 749 (6th Cir.2002),
 
 cert. denied,
 
 — U.S. -, 124 S.Ct. 270, 157 L.Ed.2d 160 (2003), and
 
 cert. denied,
 
 — U.S. -, 124 S.Ct. 83, 157 L.Ed.2d 250 (2003).
 

 Viewed against this standard, the remarks challenged by Petitioner Benge did not, in this Court’s view, deprive him of a fundamentally fair trial. In so holding, the
 
 *MLII
 
 Court notes its disapproval of the prosecutor’s penalty phase closing arguments, both as to the segments challenged by petitioner and the tenor as a whole. The Court is reminded of the Supreme Court’s description of a prosecutor’s duty, as a representative of the government: “He may prosecute with earnestness and vig- or — indeed, he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones.”
 
 Berger v. United States,
 
 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). While several of the blows delivered by the prosecution during closing arguments could be characterized as foul, this Court must remain mindful of the relevant inquiry before it — namely, whether the prosecutor’s remarks were so egregious as to deny the petitioner due process. The bar for granting habeas relief on allegations of prosecutorial misconduct has been set high. “Indeed, it is notable how often courts cite improper argument by a prosecutor and how seldom they reverse convictions because of it.”
 
 Roe v. Baker,
 
 316 F.3d 557, 566 (6th Cir.2002)(quoting
 
 United States v. Bess,
 
 593 F.2d 749, 757 (6th Cir.1979)),
 
 cert. denied,
 
 — U.S. -, 124 S.Ct. 140, 157 L.Ed.2d 95 (2003);
 
 see also Byrd v. Collins,
 
 209 F.3d 486, 537 (6 Cir.2000)(“we conclude that the demanding standard for habeas relief has not been met.”),
 
 cert. denied,
 
 531 U.S. 1082, 121 S.Ct. 786, 148 L.Ed.2d 682 (2001).
 

 Absence of Mitigating Factor
 

 Petitioner attacks numerous aspects of the prosecution’s closing argument as improper. First, petitioner argues that the prosecution denigrated the testimony of Dr. Fisher and essentially emphasized the absence of a mitigating factor. Petitioner points out that the Ohio Supreme Court has expressly forbidden prosecutors from commenting on mitigating factors not introduced by the defendant.
 

 You never once hear Dr. Fisher say that this disorder was so great and was so significant and was so overwhelming that it impaired his judgment on the night of this murder * * *.
 

 You never heard Dr. Fisher say anything about this disorder made him do it. You never heard that.
 

 You never even heard that it substantially impaired his judgment. You never heard that.
 

 You never heard from Dr. Fisher that this Defendant who he interviewed three times cannot conform his behavior to our laws, the law of society.
 

 You never heard that from Dr. Fisher. You never heard from Dr. Fisher that he couldn’t control himself. You never heard that from Dr. Fisher.
 

 (Traverse, doc.no. 47, at 45-46 (quoting J.A., 4250-51)). According to petitioner, by arguing that testimony by Dr. Fisher failed to establish that petitioner suffered from a serious mental disease or defect under R.C. § 2929.04(B)(3),
 
 [10]
 
 the prosecution essentially urged the jury to consider against petitioner the absence of a mitigating factor that petitioner never sought to establish in the first place. Petitioner insists that defense counsel presented Dr. Fisher’s testimony — not to establish that petitioner suffered a mental disease or defect under § 2929.04(B)(3) — -but to portray a picture of petitioner as a whole in connection with § 2929.04(B)(7), which permits the sentencer to consider as mitigating “Any other factors that are relevant to the issue of whether the offender should be sentenced to death.” Thus, petitioner
 
 *MLIII
 
 reasons, the prosecution erred to his prejudice in arguing that Dr. Fisher’s testimony was insufficient to establish the mitigating factor set forth in § 2929.04(B)(3).
 

 It is true that the Ohio Supreme Court has expressly cautioned trial judges and prosecutors against commenting on or otherwise drawing attention to mitigating factors not introduced by the defendant.
 
 State v. DePew,
 
 38 Ohio St.3d 275, 289, 528 N.E.2d 542 (1988). Even assuming that the prosecution ran afoul of that holding in this instance — an assumption this Court is not willing to make, since it is just as likely as not the prosecution was simply ensuring that defense counsel would not attempt to use Dr. Fisher’s testimony to establish the § 2929.04(B)(3) mitigating factor, in the event that the factor was instructed to the jury — the Court is not persuaded that the remarks were so egregious as do deny petitioner due process. Defense counsel emphasized that Dr. Fisher’s testimony was presented to paint a complete picture of petitioner, (J.A. 4222-23), and nothing about the prosecution’s remarks interfered with the jury’s ability to consider and give effect to Dr. Fisher’s testimony in that regard.
 

 Denigration of Defense Counsel
 

 Petitioner also complains that the prosecution repeatedly denigrated defense counsel.
 

 But what you have to realize is when Mr. Hedric talks about Judith Gabbard, he is not here with her interest in mind.
 

 Like he told you, he has a job to do. He told you that and that’s what he’s doing. (Traverse, doc.no. 47, at 48 (quoting J.A. 4257)). Petitioner also complains that the prosecutor suggested that defense counsel were “low” for putting petitioner’s daughter on the stand. “When he put the little girl on, how low is low, and he told you he was going to beg and that’s what he did.” (Traverse, doc.no. 47, at 48 (quoting J.A. 4215)). Petitioner argues, as he did in connection with his ninth ground for relief, that it is always improper for the prosecution to attack the institutional role of defense counsel. Attacks against defense counsel — on them personally or in their institutional capacity — are unprofessional and the Court certainly does not condone them. But under no view of these remarks, individually or in connection with the closing argument as a whole, can the Court find that petitioner was denied a fundamentally fair trial. The remarks, while plainly deliberate, were also fairly isolated.
 

 Irrelevant Character Evidence
 

 Petitioner argues that the prosecution advanced and emphasized irrelevant character evidence, and urged the jury to consider non-statutory aggravating circumstances, in an attempt to distract the jurors’ attention from the fact that only one statutory aggravating circumstance was to be weighed,
 
 i.e.,
 
 that petitioner killed Judith Gabbard during the act of robbing her, and to load the scales in favor of a death sentence.
 

 The night he got his picture taken he has got a hat on that says, “No More Mr. Nice Guy.” It’s in your evidence, but they come and they beg. * * * When you look at all this evidence, there is no reason for Judy Gabbard to have been beat to death like she was.
 

 (Traverse, doc.no. 47, at 50 (quoting J.A. 4258)). Specifically, petitioner argues that the prosecution emphasized the photograph of petitioner wearing a hat that said, “No More Mr. Nice Guy,” even though, as petitioner argued in support of his ninth ground for relief, the hat did not belong to petitioner. Petitioner argues that the prosecution used that picture to overcome petitioner’s mitigating evidence by suggesting that petitioner’s character was not
 
 *MLIV
 
 as it had been portrayed by the mitigation evidence. As the Court concluded in rejecting petitioner’s ninth claim for relief, without clarification about whether the hat even belonged to petitioner, the remark could fairly be characterized as underhanded. Further, the jury heard unrebut-ted testimony that the hat belong to Fuller, not the petitioner. In light of the passing nature of the reference, as well as the weight of the evidence against petitioner, under no view of the record can this Court conclude that the reference to the slogan deprived petitioner of a fundamentally fair trial.
 

 Norir-Statutory Aggravating Circumstances
 

 According to petitioner, the prosecution urged the jury to view the nature and circumstances of the offense as an aggravating factor, in violation of Ohio’s express statutory scheme, by repeatedly making reference to the “bludgeoning to death” of Judith Gabbard as if the murder itself was an aggravating circumstance. Petitioner argues that the prosecution attempted to appeal to jurors’ emotions and to trivialize the mitigation evidence, thereby mischaracterizing the weighing process in an effort to tip the scales in favor of a death sentence. In other words, according to petitioner, the prosecution invited the jury to deviate from the structured statutory scheme governing the sentencing process.
 

 Armed with only a single aggravating circumstance, petitioner argues, the prosecution shrewdly nudged the jurors to weigh other factors against the mitigation evidence, while overtly reminding them to follow the law. According to petitioner, the prosecution suggested to jurors that it was “fair” for jurors to return the death sentence if they found that that Judith Gabbard’s death was “uncalled for” and “undeserved.”
 

 It’s about the law. It’s about the law, and if you find that the beating of her to death in the commission of aggravated robbery is a circumstance which outweighs the fact that he got married, got divorced, and didn’t have a little red wagon when he was a boy, if that all outweighs what he did, then you do what’s fair and what’s reasonable.
 

 But if you find that Judy Gabbard’s death was uncalled for, was a bludgeoning that she didn’t deserve and that the commission of that robbery outweighs all of these little things that they’re talking about, it’s not the quantity, it’s the quality, you come back with a death sentence. That’s fair. That’s fair. Thank you.
 

 (Traverse, doc.no. 47, at 53-54 (quoting J.A. 4216)). Petitioner also complains that, by encouraging the jurors to review the photos depicting Judy Gabbard’s fatal wounds, the prosecution attempted to convert the gruesome nature of the murder into an aggravating circumstance. Further, according to petitioner, the prosecution told the jurors they should “ignore the death sentence” only if they felt it was fair for petitioner to read books and watch television.
 

 It’s not as simply [sic] as an eye for an eye and a tooth for a tooth. It’s the law and by doing this he has created a debt he cannot pay. They talked about him being in prison and the things he would do there about waiting and him showering and eating.
 

 Is it fair that he be able to watch TV? Is it fair he be able to read books? Is it fair that he be able to walk across the yard and feel the sun on his face? Is that fair in this case? If it is, then go on and ignore the death sentence, and tell me that was your verdict.
 

 (Traverse, doc.no. 47, at 55 (quoting J.A. 4254-55)).
 

 
 *MLV
 
 While some of the challenged remarks arguably sought to appeal to the jurors’ emotions, rather than encourage the jurors to find, based on the evidence, that the aggravating circumstance outweighed the mitigating factors, these remarks did not, in the Court’s view, deprive petitioner of a fundamentally fair sentencing hearing. Contrary to petitioner’s assertion that he encouraged the jurors to consider additional non-statutory aggravating circumstances or otherwise mischaraeterized the weighing process, the prosecutor repeatedly referred to a single aggravating circumstance and reminded the jurors to follow the law as explained to them by the trial court.
 
 [11]
 
 Balanced against the arguably improper comments highlighted by petitioner, these remarks convince the Court that the prosecution’s closing argument, when considered as a whole, was not so egregious as to deny petitioner a fundamentally fair trial.
 

 Trivializing Mitigation Evidence
 

 Finally, according to petitioner, the prosecution repeatedly trivialized the concept of mitigation, as well as the mitigation evidence that petitioner presented. Petitioner points to the prosecution’s suggestion that petitioner’s actions were not excused just because he never had “a little red wagon,” or because he could not remember his father, or because his stepfather was tough on him.
 

 Go by what the law says because I think if you go by the law, not having a little red wagon when you’re a boy doesn’t mitigate anything.
 

 (Traverse, doc.no. 47, at 56 (quoting J.A. 4260)).
 

 The matter of fact, though, is you have that evidence to consider which is the circumstance and the nature of her death and her aggravated robbery.
 

 And then you tell me that any of these things mitigate that. You tell me that’s fair.
 

 You tell me that when he was two or three he couldn’t remember his father. You tell me besides that, Mr. Piper, he had a job at one time and made good money and he had a stepfather which is a little bit convenient that we didn’t hear from him.
 

 But there’s a stepfather who wasn’t nice to him, and then you have got that he voluntarily liked to do drugs.
 

 He liked to feel good all the time on cocaine, and that mitigates? That outweighs this? That’s fair?
 

 (Traverse, doc.no. 47, at 56 (quoting J.A. 4254-55)). Further, according to petitioner, the prosecution implied that petitioner was lucky to have an abusive stepfather, “[Y]ou know, how many boys would like to have a stepdad be there,” (J.A. 4259); belittled testimony by petitioner’s mother, “is all that going to be outweighed by a mother’s love because you’re always going to have a mother’s love,” (J.A. 4212); and noted that many people experienced trou
 
 *MLVI
 
 bled childhoods without committing the acts that petitioner committed.
 

 A lot of people do drugs. Lots of people had stepparents. Lots of kids didn’t like school. Lots of people’s families have died. Lots of people had jobs, and none of them mitigate what he did.
 

 All those people that have all those same problems didn’t go out and beat somebody to death because they wanted money for drugs.
 

 ^ ^ ^
 

 Do you know how many people would like to have the kind of job and make the kind of money he made?
 

 Do you know how many people would like to have the opportunity to be in life. Do you know how many people would like to have the family support and family background that he had, the opportunity for that.
 

 You know, there are people that get in that circumstance on that witness stand that have to testify and never had a chance in life, trapped by their family, their environment, by the fact that they have no money, no opportunity, no chance for education.
 

 (Traverse, doc.no. 47, at 58 (quoting J.A. 4260, 4214)).
 

 Such arguments are improper, petitioner argues, because they run afoul of the Eighth Amendment principle of individualized sentencing in capital cases. The Court is not persuaded that error occurred here. While the challenged remarks, at times, inappropriately trivialized the concept of mitigation evidence, considered as a whole, they did not rise to level of undercutting mitigation so completely as to deny fair consideration thereof; at most, they merely served as an argument for why the aggravating circumstance outweighed the mitigation evidence.
 
 See Bowling v. Parker,
 
 344 F.3d 487, 502 (6th Cir.2003).
 

 In sum, the Court is not persuaded that the prosecution’s closing argument was so egregious as to deny petitioner fundamental fairness. In reaching this conclusion, the Court notes that the penalty phase jury instructions explaining the statutory weighing process, the role of mitigation evidence, and the fact that the Court told the jury that the attorneys’ arguments do not constitute evidence or the law helped cure some of the improprieties scattered throughout the prosecution’s closing arguments.
 
 See Byrd v. Collins, supra,
 
 209 F.3d at 537. Finally, the Court reiterates that the bar for granting habeas relief on allegations of prosecutorial misconduct is high, and that the relevant inquiry is limited to whether the prosecutor’s remarks were so egregious as to deny the petitioner due process. Bound to follow this standard, the Court simply cannot find that the remarks challenged by Petitioner Benge deprived him of a fundamentally fair trial. Petitioner’s tenth ground for relief is without merit and will be denied.
 

 Eleventh Ground for Relief
 
 — Benge
 
 was denied a fair trial and due process of law as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the trial court refused to permit access to transcripts of the grand jury proceedings
 

 The petitioner contends in his eleventh ground for relief that he was denied a fair trial and due process of law as guaranteed by the Six and Fourteenth Amendments and that he was denied access to transcripts of the grand jury proceedings. Petitioner contends that this claim is related to the allegations raised in the second ground for relief and is based upon the testimony of Awantha Shields. Petitioner theorizes that Shields lied when she testified that he told her that he had killed Ms. Gabbard in order to steal her ATM card. He further theorizes that these facts may have been reflected in the Grand Jury proceedings.
 

 
 *MLVII
 
 To their credit, petitioner’s counsel again note that they have no particularized information in support of this claim. Instead, they ask the Court to review
 
 in camera
 
 the testimony given by Awantha Shields to the grand jury on March 3, 1993.
 

 The Court has carefully reviewed the grand jury of Awantha Shields. As noted with respect to the second ground for relief, the Court can find no testimony given by Awantha Shields to the grand jury which would raise even a suspicion that she lied at trial. Further, the record contains no evidence that she was threatened by prosecutors or given a promise of leniency for her boyfriend, John Fuller, in exchange for her testimony.
 

 The Court concludes that the eleventh ground for relief is without merit.
 

 Twelfth Ground for Relief
 
 — Benge
 
 was denied the ñght to the effective assistance of counsel
 

 Petitioner argues in his twelfth ground for relief that he was denied his right to the effective assistance of counsel during the guilt and sentencing phases of the trial. (Petition, doc.no. 14, at ¶¶ 112-132). Petitioner argues that his attorneys performed unreasonably and to his prejudice in failing to obtain bank surveillance photographs demonstrating that he and the victim used her ATM card together, in failing to obtain a clinical psychologist to testify during both phases of the trial about the violent relationship that petitioner shared with the victim and the manner in which his drug abuse contributed to his commission of the offense, and in failing to present testimony from friends and family members corroborating the violent relationship between petitioner and the victim.
 

 Petitioner further argues that counsel performed unreasonably and to his prejudice in failing even to attempt to suppress the two statements petitioner gave to police. The first, which came immediately after petitioner had consumed $75 worth of cocaine, detailed a concocted story about petitioner and the victim having been attacked by two black men, the admission of which damaged petitioner’s credibility; the second came only three and a half hours later and, not having been fully transcribed, allowed for the admission into evidence of inaccurate or incorrect information. Petitioner argues that there was no basis justifying counsel’s failure to file a motion to suppress the statements, given petitioner’s arguable intoxication at the time he executed a waiver of his rights and made the statements.
 

 Petitioner also argues that counsel failed to object when the prosecutor suggested, without evidentiary foundation, other wrongdoing on the part of petitioner. While cross-examining petitioner, the prosecution suggested that petitioner had robbed the victim’s son and the victim was afraid petitioner might attempt to rob her, too; and that the victim had wanted petitioner to move out. Petitioner complains that neither question was ever corroborated or supported by the evidence. Finally, petitioner argues that trial counsel failed to object to numerous trial errors, ranging from various jury instructions by the trial court to comments by the prosecution. The Court will discuss those trial errors more fully
 
 infra.
 

 Petitioner presented some of these allegations to the Supreme Court of Ohio on direct appeal, and presented some of these allegations, supported with evidence
 
 de hors
 
 the record, to the state courts in postconviction proceedings. Those allegations raised by petitioner on direct appeal — counsel’s failure to file a motion to suppress petitioner’s statements, counsel’s failure to object to unfounded innuendo by prosecutor during cross-examination of petitioner, and counsel’s failure to object to numerous trial errors—
 
 *MLVIII
 
 were rejected in detail by the state court of appeals under the two-part
 
 Strickland
 
 analysis, but were rejected without opinion by the Supreme Court of Ohio.
 
 [12]
 
 Petitioner urges this Court to review those claims
 
 de novo,
 
 due to the failure of the Ohio Supreme Court to cite clearly established Federal law. In the alternative, petitioner argues that the Ohio Supreme Court’s rejection of his claims amounts to an unreasonable application of clearly established Federal law warranting habeas relief.
 

 Borrowing from the procedural default doctrine stating, “Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground,”
 
 Ylst v. Nunnemaker,
 
 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), this Court is of the view that it should review the state court’s judgment rejecting the ineffective assistance claims set forth above within the constraints of § 2254(d), and that the state court judgment this Court will review under § 2254(d) is the decision issued by the state court of appeals.
 
 See Campbell v. Rice,
 
 302 F.3d 892, 896 (9th Cir.2002)(citing
 
 Ylst v. Nunnemaker
 
 for the proposition that when determining whether state court decision was contrary to or unreasonable application of clearly established Federal law, federal court should look to state’s last reasoned decision). The Ohio Supreme Court in this case rejected petitioner’s ineffective assistance of counsel claims after fully consideration; it simply declined to state its reasons in writing.
 
 Benge,
 
 75 Ohio St.3d at 139, 661 N.E.2d 1019. The state court of appeals below, on the other hand, stated in writing its reasons for rejecting under
 
 Strickland v. Washington
 
 the same ineffective assistance claims that petitioner subsequently presented to the Supreme Court of Ohio.
 
 State v. Benge,
 
 Case No. CA93-06-116, 1994 WL 673126, **20-23, 1994 Ohio App. LEXIS 5419, at *58-64 (Ohio App. 12 Dist. Dec.5, 1994); J.A. at 1236-37. Consequently, this Court will grant relief on the ineffective assistance claims set forth above only if the decision by the state court of appeals rejecting those claims was contrary to, or involved an unreasonable application of, clearly established Federal law. 28 U.S.C. § 2254(d).
 

 As for the remainder of petitioner’s claims of ineffective assistance of trial counsel — counsel’s failure to present bank records and surveillance photographs, counsel’s failure to present a clinical psychologist and drug abuse expert, and counsel’s failure to present testimony from friends and relatives regarding the violent relationship between petitioner and the victim — those claims were considered and rejected on the merits by the Ohio courts in state postconviction proceedings. The last state court to issue a reasoned decision was the Ohio Court of Appeals for the Twelfth Appellate District. This Court accordingly must determine whether the state court of appeals’ judgment rejecting those claims contravened or unreasonably applied clearly established Federal law as determined by the United States Supreme Court.
 
 State v. Benge,
 
 Case No. CA97-08-163, 1998 WL 204941, 1998 Ohio App. LEXIS 1764 (Ohio App. 12 Dist. Apr.27, 1998); J.A. 2964.
 

 The right to counsel guaranteed by the Sixth Amendment is the right to the effec
 
 *MLIX
 
 tive assistance of counsel.
 
 McMann v. Richardson,
 
 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:
 

 First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
 

 Strickland v. Washington,
 
 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). With respect to the first prong of the
 
 Strickland
 
 test, the Court notes that, “[bjeeause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.”
 
 Id.
 
 at 689, 104 S.Ct. 2052.
 

 To establish the second prong of the
 
 Strickland
 
 test,
 
 ie.,
 
 prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for counsel’s errors, the result of the proceedings would have been different.
 
 Id.
 
 at 694, 104 S.Ct. 2052. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.”
 
 Id.
 
 In the context of counsel’s performance during the sentencing phase of a capital case, “ ‘the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.’ ”
 
 Campbell v. Coyle,
 
 260 F.3d 531, 552 (6th Cir.)(quoting
 
 Strickland, supra,
 
 466 U.S. at 695, 104 S.Ct. 2052),
 
 cert. denied,
 
 535 U.S. 975, 122 S.Ct. 1448, 152 L.Ed.2d 390 (2001). Because petitioner must satisfy both prongs of the
 
 Strickland
 
 test to demonstrate ineffective assistance of counsel, should the Court determine that petitioner has failed to satisfy one prong, it need not consider the other.
 
 Strickland,
 
 466 U.S. at 697, 104 S.Ct. 2052.
 

 Inherent in counsel’s responsibilities is the duty to investigate. “[Cjounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.”
 
 Strickland, supra,
 
 466 U.S. at 691, 104 S.Ct. 2052;
 
 see also Carter v. Bell,
 
 218 F.3d 581, 600 (6th Cir.2000). The importance of competent representation during the penalty phase of a capital trial cannot be understated, especially with respect to the duty to investigate, since, as a practical matter, all that stands between a defendant who has been convicted of capital murder and a death sentence is whatever mitigation evidence he can muster.
 
 Mapes v. Coyle,
 
 171 F.3d 408, 426 (6th Cir.),
 
 cert. denied, 528
 
 U.S. 946, 120 S.Ct. 369, 145 L.Ed.2d 284 (1999).
 

 [Cjertainly, trial counsel must commit a serious error to be judged unconstitutionally ineffective. However, when a client faces the prospect of being put to death unless counsel obtains and presents something in mitigation, minimal standards require some investigation.
 

 Id.
 
 The Sixth Circuit expanded on counsel’s duty to investigate in connection with the mitigation phase of a capital trial, adding in
 
 Carter v. Bell, supra,
 
 218 F.3d at 596, that, “The sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility.” The question before the Court is whether the state court decisions rejecting any or all of petitioner’s allegations of ineffective assistance of counsel contravened or unreason
 
 *MLX
 
 ably applied clearly established Federal law.
 

 Counsel’s Failure to Introduce Bank Records and Surveillance Photographs
 

 Petitioner argues that his trial attorneys performed unreasonably and to his prejudice in failing to obtain and present bank records and ATM surveillance photos showing, as recently as three months before the murder, petitioner using Judy Gabbard’s ATM card, in her presence, to withdraw cash. That evidence, petitioner argues, would have corroborated his testimony that he had Gabbard’s permission to use her ATM card and would have undermined the state’s theory that petitioner had robbed Gabbard for the purpose of stealing her ATM card. Petitioner argues that counsel performed unreasonably in failing to investigate and obtain readily-available evidence, and that he was prejudiced by the deficient performance because the state’s aggravated robbery case was weak to begin with.
 

 Petitioner presented this claim to the state courts in his postconviction action. The state appellate court affirmed the trial court’s decision rejecting his claim on the ground that there was no reasonable probability that, but for counsel’s omission in this regard, the outcome of petitioner’s trial would have been different. J.A. at 2968. More specifically, the trial court concluded that the evidence obtained by petitioner subsequent to trial — a series of photographs that show him withdrawing cash from an ATM machine while Judy Gabbard stands in the background- — was cumulative to evidence that trial counsel did present at trial to show that petitioner had used Gabbard’s ATM card with her permission. J.A. 2517-18. The trial court went on to conclude that evidence demonstrating petitioner’s use of the card three months prior to the murder would have been consistent with the State’s case, since it had been the state’s theory that petitioner knew Gabbard’s personal identification number from past permissive use.
 
 Id.
 

 The Court cannot find that the state courts’ decisions contravened or unreasonably applied clearly established Federal law because the Court cannot find that counsel performed unreasonably or to petitioner’s prejudice. The record demonstrates that counsel conducted some investigation, insofar as they presented evidence and argument demonstrating past permissive use by petitioner of Gabbard’s ATM card. Petitioner has not shown that counsel performed unreasonably in failing to investigate or obtain the evidence in question — namely, the surveillance videos and bank records. The most petitioner has demonstrated is that counsel could have done more, which will almost always be the case and will almost never constitute unreasonably deficient performance under
 
 Strickland.
 
 Further, this Court is in full agreement with the trial court’s conclusion that the evidence in question was, at best, cumulative to evidence presented at trial, and at worst, entirely consistent with the State’s case. That being so, petitioner cannot demonstrate a reasonable probability that the outcome of his trial would have been different, had counsel introduced the bank surveillance photos. This component of petitioner’s twelfth ground for relief is plainly without merit. Thus, the state courts’ rejection of this claim was not contrary to or an unreasonable application of
 
 Strickland.
 

 Counsel’s Failure to Obtain Services of Clinical Psychologist
 

 Petitioner also argues that his attorneys performed unreasonably and to his prejudice in failing to obtain the services of a clinical psychologist for both phases of his trial. Specifically, petitioner argues
 
 *MLXI
 
 that counsel were ineffective for failing to obtain the services of a clinical psychologist and/or drug abuse expert to testify about petitioner’s abuse of cocaine. According to petitioner, that testimony would have been useful during the guilt phase of the trial in explaining to lay jurors the impact that petitioner’s drug abuse had on his belief that Gabbard was trying to kill him and on his conduct on the evening she was murdered. Petitioner argues that such testimony would have been valuable during the mitigation phase in explaining the crime without trying to excuse it, and in adding to any residual doubt the jurors may have had about his guilt. Petitioner assails the state courts’ conclusion that, due to the fact that defense counsel presented the testimony of Dr. Fisher during the mitigation hearing, further testimony by another clinical psychologist or drug abuse would have been cumulative, or an alternative to, evidence presented at trial. Petitioner argues that Dr. Fisher was not a drug abuse expert, and that Dr. Smith’s affidavit, submitted in support of petitioner’s postconviction petition, presented information outside the scope of Dr. Fisher’s testimony. Petitioner argues that counsel violated their duty to conduct reasonable investigation to determine whether there was a need for expert assistance, and that counsel’s error was prejudicial to both phases of petitioner’s capital trial.
 

 Petitioner presented this claim to the state courts in his postconviction action. The state court of appeals affirmed the trial court’s decision rejecting petitioner’s claim on the ground that petitioner could not demonstrate a reasonable probability that the outcome of his trial would have been different, but for counsel’s failure to obtain a clinical psychologist and/or drug abuse expert. J.A. 2968. The trial court had cited a number reasons for concluding that petitioner was not prejudiced by counsel’s failure to obtain the services of a clinical psychologist and/or drug abuse expert. Noting that defense counsel did present the testimony of Dr. Roger Fisher during the mitigation hearing and that Dr. Fisher’s testimony touched upon petitioner’s drug history and cocaine abuse, the trial court concluded that the information set forth in Dr. Smith’s affidavit was either cumulative to, or an alternative for, information presented at trial. J.A. 2518-19, 2522-23. With respect to the guilt phase of petitioner’s trial, the trial court concluded that the information set forth in Dr. Smith’s affidavit did not demonstrate ineffective assistance of counsel. J.A. 2518-19. The trial court also noted that, to the extent petitioner was suggesting that a psychologist or psychiatrist could have testified about the effects of petitioner’s drug abuse on his perception that Gabbard was trying to kill him and about his conduct that night, the testimony would have been inadmissible and irrelevant. Under Ohio law, the trial court explained, a defendant may not offer psychological or psychiatric testimony that is not related to an insanity defense to demonstrate that the defendant lacked the capacity to form specific intent.
 
 Id.
 
 The trial court further noted that, with respect to petitioner’s defense that he was guilty at most of voluntary manslaughter, no expert testimony was necessary for the jurors to determine whether there was serious provocation occasioned by Gabbard that was reasonably sufficient to incite petitioner to use deadly force. Since that determination “rose or fell with the jury’s assessment of Defendant Benge’s testimony vis a vis the physical evidence and testimony of the State’s witnesses,” J.A. 2519, the trial court concluded “there is no reasonable probability that, had counsel obtained and used the expert testimony in question, the result of Defendant’s trial would have been any different.” J.A. 2519-20 (citing
 
 Strickland,
 
 466 U.S. at 693, 104 S.Ct. 2052;
 
 State v. Loza,
 
 71 Ohio St.3d 61, 83-84, 641 N.E.2d 1082 (1994)).
 

 
 *MLXII
 
 The Court cannot find that the state courts’ decisions contravened or unreasonably applied clearly established Federal law because the Court cannot find that counsel performed unreasonably or to petitioner’s prejudice. In determining whether a particular act or omission on the part of counsel was outside the wide range of professional norms, this Court must accord a high measure of deference to counsel’s decisions.
 
 Strickland,
 
 466 U.S. at 681, 104 S.Ct. 2052;
 
 see also White v. McAninch,
 
 235 F.3d 988, 994-95 (6th Cir.2000). Of course, a “strategic” or “tactical” decision is not automatically insulated from review, if it does not appear that the decision was supported by sufficient investigation.
 

 The determination as to whether counsel’s trial strategy amounts to ineffective assistance of counsel should be made with respect to the thoroughness of the pretrial investigation that counsel conducted. The more thorough the investigation, the more deference the trial strategy receives, while strategic decisions made after incomplete investigation receive less.... ”
 

 White v. McAninch,
 
 235 F.3d at 995-96 (citing
 
 Strickland,
 
 466 U.S. at 690-91, 104 S.Ct. 2052). Further, regarding an attorney’s decision of whether to obtain the services of mental health experts, attorneys generally are not also mental health experts and cannot be expected to second-guess the evaluations rendered by experts.
 
 Wilson v. Greene,
 
 155 F.3d 396, 403 (4th Cir.),
 
 cert. denied sub nom., Wilson v. Taylor,
 
 525 U.S. 1012, 119 S.Ct. 536, 142 L.Ed.2d 441 (1998). Further, counsel are not required to shop for experts who will testify exactly as counsel prescribes.
 
 See Dowthitt v. Johnson,
 
 230 F.3d 733, 748 (5th Cir.2000)(“Under the circumstances, trial counsel was not deficient by not canvassing the field to find a more favorable defense expert.”).
 

 With respect to the mitigation phase of petitioner’s trial, the Court rejects petitioner’s claim that his attorneys were ineffective for failing to present the testimony of a psychologist or drug abuse expert, either in addition to or in lieu of the testimony of Dr. Fisher. It is obvious from the mitigation record that counsel’s mitigation strategy was to paint a complete picture of petitioner as a person.
 
 [13]
 
 Dr. Fisher’s testimony seemed to emphasize the extent to which petitioner was molded by his childhood history of rejection, feelings of inadequacy, and abuse. J.A. 4121-4173. Dr. Fisher explained that, as a result of his childhood experiences, petitioner turned to drug use at a young age. J.A. 4132-33. Dr. Fisher went on to explain the pervasiveness of petitioner’s drug use, as well as the problems in his personal life that resulted. J.A. 4133-4141. It is true, as petitioner complains, that Dr. Fisher did not discuss petitioner’s drug abuse as a contributing factor to his conduct on the evening of the murder; this approach was not counsel’s strategy at the mitigation phase, and this Court is not inclined to second-guess trial strategy that is supported by reasonable investigation. Having reviewed Dr. Smith’s affidavit submitted in support of petitioner’s postcon-viction action, (J.A.2052-2063), the Court would agree the information and conclusions set forth by Dr. Smith might have been helpful in support of a mitigation strategy seeking to emphasize the extent and duration of petitioner’s drug addiction and use as that might have contributed to his conduct that night. But as noted above, that was not defense counsel’s miti
 
 *MLXIII
 
 gation strategy. Petitioner has not demonstrated, and the record does not otherwise suggest, that counsel abandoned their duty to conduct a reasonable investigation in support of their mitigation strategy. Different attorneys may have pursued a different mitigation strategy, but this Court cannot say that the mitigation strategy pursued by petitioner’s attorneys, or the evidence they presented in support, was objectively unreasonable and one that no reasonable attorney would have pursued. Moreover, the Court cannot find that the state courts were unreasonable in concluding, under the prejudice prong of
 
 Strickland,
 
 that there was no reasonable probability that the outcome of petitioner’s mitigation hearing would have been different if his attorneys had presented the testimony of a drug abuse expert.
 

 For the reasons discussed by the trial court in rejecting petitioner’s postcon-viction action, this Court also rejects petitioner’s claim that his trial attorneys were ineffective for failing to present the testimony of an additional psychologist or drug abuse expert during the guilt phase of his trial. While it is true that such testimony, as described by petitioner in his petition and traverse, would have been consistent with trial counsel’s guilt phase strategy— namely, to demonstrate that petitioner killed Judith Gabbard in a fit of rage after Gabbard allegedly tried to run him over with her car and to negate the state’s theory that petitioner killed Judith Gab-bard for the purpose of stealing her ATM card — arguably, that testimony would have been neither admissible nor relevant to bolster petitioner’s version of the events. Petitioner asserts that testimony regarding the extent of his drug addiction in general, and/or the extent of his intoxication on the evening in question could have shed light on his perception that Gab-bard was trying to kill him and on his conduct in response to the perceived threat. To the extent that petitioner faults his attorneys for failing to present testimony that his drug addiction or intoxication somehow negated his ability to commit aggravated murder or aggravated robbery, Ohio law is clear that “[a] defendant may not introduce expert psychiatric testimony, unrelated to the insanity defense, for the purpose of showing that he lacked the capacity to form the specific mental state required for a particular crime.”
 
 State v. Wilcox,
 
 70 Ohio St.2d 182, 436 N.E.2d 523, paragraph two of the syllabus (1982);
 
 see also State v. Huertas,
 
 51 Ohio St.3d 22, 27-28, 553 N.E.2d 1058 (1990). To the extent that petitioner faults his attorneys for failing to present testimony that his drug addiction or intoxication contributed to his perception that Gabbard was trying to kill him or to the nature of his actions in response to that perceived threat, Ohio law is also clear that “[i]n determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied.”
 
 State v. Shane,
 
 63 Ohio St.3d 630, 634, 590 N.E.2d 272 (1992)(quoting
 
 State v. Deem,
 
 40 Ohio St.3d 205, 533 N.E.2d 294, paragraphs five of the syllabus (1988)). Thus, testimony regarding petitioner’s subjective perceptions that evening would have been irrelevant to the jurors’ determination whether Judith Gabbard provoked petitioner and whether that provocation was reasonably sufficient enough to provoke a deadly response.
 

 Given the foregoing, the failure on the part of petitioner’s attorneys to utilize the services of a drug abuse expert during the guilt phase of the trial cannot be characterized as something only an objectively unreasonable attorney would do. The testimony proffered by petitioner was likely inadmissible, and certainly irrelevant. Further, emphasizing drug addiction and voluntary intoxication is almost always a risky strategy, in light of society’s general
 
 *MLXIV
 
 attitude toward drug and alcohol addiction. For all of these reasons, the Court further concludes that there is no reasonable probability that the outcome of petitioner’s trial would have been different, but for counsel’s failure to utilize the services of a drug abuse expert during the guilt phase of the trial. Since the state courts’ rejection of this claim was not contrary to, or an unreasonable application of
 
 Strickland,
 
 this aspect of petitioner’s twelfth ground for relief must be rejected.
 

 Counsel’s Failure to Introduce Testimony About Violent Relationship
 

 Petitioner argues that his trial attorneys performed unreasonably and to his prejudice in failing to present testimony from friends and family as to the violent relationship between petitioner and Judith Gabbard. Such testimony, according to petitioner, would have substantiated his assertions that Gabbard had been violent toward him in the past and that he had reason to fear she might try to harm or kill him. (Petition, doc.no. 14, at ¶ 117; Traverse, doc.no. 47, at 71).
 

 Petitioner presented this claim to the state courts in his postconviction action and supported it with seven affidavits from various family members and friends. The state courts rejected petitioner’s allegations, finding that the evidence he submitted was insufficient to prove his claim of ineffective assistance of counsel. Specifically, the trial court noted that, in a similar case, evidence of a historically stormy relationship between the offender and victim was deemed insufficient as a matter of law to incite the offender to use deadly force. (J.A. 2520-21) (citing
 
 State v. Deem,
 
 40 Ohio St.3d 205, 211, 533 N.E.2d 294 (1988)). The trial court reasoned that such evidence, accordingly, would have added little to defense counsel’s theory. The trial court went on to note that nearly all of the material alleging a history of violence between petitioner and Judith Gabbard—
 
 i.e.,
 
 affidavits from family members and friends — consisted of hearsay statements that the trial court would have deemed inadmissible.
 
 Id.
 
 For those reasons, the trial court concluded that there was no reasonable probability that the outcome of petitioner’s trial would have been different, had counsel presented the proffered testimony.
 
 Id.
 
 The state appellate court affirmed the trial court’s factual findings and legal conclusions, stating that petitioner could not demonstrate prejudice under
 
 Strickland
 
 from counsel’s failure to use the evidence in question. (J.A. 2968-69).
 

 The Court is satisfied that the state courts’ decisions were not contrary to, or an unreasonable application of,
 
 Strickland.
 
 Neither petitioners allegations, nor the evidence submitted with his postconviction action, demonstrate that counsel were derelict in their duty to investigate or that counsel neglected to use evidence that any other reasonable attorney would have utilized. This Court has reviewed the post-conviction affidavits
 
 [14]
 
 that were considered and rejected by the state courts, and can find nothing unreasonable about the state courts’ conclusion that the allegations of a stormy relationship between petitioner and the victim were cumulative, or an alternative to, evidence that was presented at trial. It is true that the infor
 
 *MLXV
 
 mation set forth in the affidavits was more expansive and colorful than that presented at trial, but that does not change the fact that the information was cumulative in nature to that presented at trial. Further, the Court can find nothing unreasonable about the state courts’ conclusion that the affidavits were immaterial, because they consisted largely of inadmissible hearsay and because such evidence was rejected in a similar case as legally insufficient to have incited the offender to respond with deadly force. It is difficult to characterize as material or helpful evidence that the trial court would have ruled inadmissible. Moreover, it is entirely possible, too, that trial counsel decided as a matter of strategy not to emphasize past incidents of violence between petitioner and the victim, out of concern that such testimony, not to mention evidence that testimony could have invited in rebuttal, might have reflected badly on petitioner.
 

 In light of the foregoing, the Court cannot find either that defense counsel were objectively unreasonable in failing to present the testimony of family members and friends as to the stormy relationship between petitioner and the victim, or that petitioner was prejudiced by counsel’s omission. The state courts’ rejection of this claim was not contrary to or an unreasonable application of
 
 Strickland,
 
 and this aspect of petitioner’s twelfth ground for relief, accordingly, must be rejected.
 

 Counsel’s Failure to File Motion to Suppress Statements
 

 Petitioner argues that one of the most fundamental errors made by his trial attorneys was their failure to file a motion to suppress the two statements that he made to the police. (Petition, doc.no. 14, at ¶¶ 118-124; Traverse, doc.no. 47, at 65-67). In his first statement, petitioner told police that Gabbard had been killed by two black men who had attacked them (petitioner and Gabbard) and robbed them. In his second statement, petitioner admitted responsibility for Gabbard’s death, but insisted that he had killed her in a fit of rage after she tried to run him over with her car. Petitioner contends that he gave the first statement immediately after consuming $75 to $80 worth of crack cocaine, and the second statement just three and a half hours after consuming those intoxicants. Thus, according to petitioner, there existed a basis for attacking the validity of both statements, which basis counsel recognized, and counsel’s patently unreasonable failure to try to suppress the statements resulted in disastrous consequences. Petitioner points out that the first statement, which he admitted was a fabrication, seriously damaged his credibility. The second statement, which was incompletely transcribed, resulted in the admission of inaccurate or incomplete information.
 

 Petitioner presented this allegation on his direct appeals of right, first to the court of appeals and then to the Supreme Court of Ohio. While the Supreme Court of Ohio rejected his claim without expressly writing on the claim, the appellate court below issued a considered, reasoned decision, and rejected petitioner’s claim under the two-part test set forth in
 
 Strickland.
 

 Appellant also claims that the failure of his trial counsel to file a motion to suppress the two statements appellant gave to the police constitutes ineffective assistance. Appellant argues that his counsel should have moved to suppress these confessions on the ground that appellant’s state of intoxication due to his use of drugs shortly before giving the first statement affected his ability to make a knowing and intelligent waiver of his right against self-incrimination and right to an attorney. However, nothing in the record indicates that the confession or waiver was attributable to coercive police activity or that appellant was so intoxicated that he could not give
 
 *MLXVI
 
 a voluntary, knowing, and intelligent waiver, (citations omitted). On the contrary, Detective Nugent testified that appellant appeared calm and relaxed during both statements, and he was apparently alert and coherent enough to give the police a detailed false account in his first statement that Gabbard was killed by two men who were trying to rob them.
 

 Furthermore, the confessions were not improperly obtained as the record shows that appellant was informed of his Miranda rights prior to making each statement, (citation omitted). After appellant requested an attorney, all police interrogation was stopped. Questioning was resumed only after appellant initiated conversation by telling the police that he wished to make another statement and he again read and waived his Miranda rights, (citation omitted). Therefore, the failure of appellant’s counsel to file a motion to suppress these statements was not unreasonable or ineffective as there is no basis, under these facts, that such a motion would have succeeded as to either statement, (citation omitted).
 

 In addition, counsel’s decision not to file a motion to suppress appellant’s second statement was expressly noted on the record as a matter of trial strategy which was discussed with and agreed to by appellant, (citation omitted). Appellant’s second statement supported his voluntary manslaughter defense and was consistent with the theory of the case presented by the defense throughout the trial that appellant was provoked by Gabbard and killed her in a fit of rage, (citation omitted).
 

 J.A. 1236-37.
 

 The Court has reviewed the record and is of the view that the appellate court’s decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. Further, the Court is satisfied that the appellate court’s decision did not involve an unreasonable determination of the facts.
 

 This Court is of the view that, even accepting as true the assertion that petitioner consumed a considerable quantity of crack cocaine, the record simply does not demonstrate that petitioner was so intoxicated at the time he gave either statement as to preclude him from making a knowing, voluntary, intelligent waiver of his right to remain silent. On the contrary, what the record in this case did reflect, as pointed out by the state appellate court, were numerous indications that petitioner was cognizant, alert, responsive, and coherent, all of which undermines any claim that his consumption of crack precluded him from making knowing, voluntary, intelligent statements to the police. It appears from Detective Nugent’s testimony recounting the two statements petitioner gave, that petitioner was responsive to police questioning, coherent in his remarks, and appeared calm and laid back. J.A. 3609, 3637. Petitioner was able to recount in his first statement to the police the exact, detailed story that he had told Awantha Shields and John Fuller he would give if the police questioned him about Gabbard’s murder — namely, that Gabbard was murdered by two black men who attacked and tried to rob them. J.A. 3605-3607. Just before giving his second statement, petitioner was given food. J.A. 3611.
 

 Finally, it bears reminding that trial counsel stated on the record that they had elected, as a matter of strategy, not to seek suppression of the second statement because it was consistent with their voluntary manslaughter defense. J.A. 3160-62. Counsel stated that they had explained their reasoning to petitioner and that he was in agreement with their decision not to
 
 *MLXVII
 
 try to suppress the second statement.
 
 Id.
 
 The trial court even conducted a brief colloquy with petitioner to ensure that he was, in fact, in agreement with his attorneys’ decision in this regard.
 
 Id.
 
 Thus, counsel’s failure to file a motion to suppress the second statement, and arguably the first statement, was the result of a calculated strategy, not oversight or neglect. Counsel’s decision is entitled to a great deal of deference.
 

 In sum, the Court cannot find, under any reading of this record, that counsel performed unreasonably or to petitioner’s prejudice in failing to file a motion to suppress these statements. The state courts, accordingly, did not adjudicate petitioner’s claim in a manner that contravened or unreasonably applied
 
 Strickland.
 
 This aspect of petitioner’s twelfth ground for relief must be denied.
 

 Counsel’s Failure to Object to Improper Innuendo from Prosecution
 

 Petitioner also argues that his trial attorneys performed unreasonably and to his prejudice when they failed to object to, or demand an articulation of good-faith basis for, questions by the prosecutor that insinuated other wrongdoing by petitioner. (Petition, doc.no. 14, at ¶¶ 125-129; Traverse, doc.no. 147, at 67-68). Specifically, petitioner challenges instances when the prosecutor, in cross-examining petitioner, asked whether Judith Gabbard had previously accused petitioner of stealing from her and whether Gabbard had decided to no longer allow petitioner to live with her. Petitioner complains no evidence was ever introduced to support these assertions and that he was prejudiced in the eyes of the jurors by the questions.
 

 Petitioner presented this allegation on his direct appeals of right, first to the court of appeals and then to the Supreme Court of Ohio. While the Supreme Court of Ohio rejected his claim without expressly writing on the claim, the appellate court below issued a considered, reasoned decision, and rejected petitioner’s claim under the two-part test set forth in
 
 Strickland.
 

 Appellant further claims that defense counsel was ineffective in failing to object to certain questions the prosecutor asked appellant during cross-examination. Specifically, appellant contends that the prosecutor lacked a good-faith basis for questioning him regarding a previous incident where Gabbard allegedly accused him of stealing $200 from her son’s wallet and regarding Gab-bard’s alleged decision to no longer allow appellant to live with her.
 

 However, this line of questioning was proper and thus counsel’s failure to object was not ineffective assistance; the record shows that the prosecutor possessed a good-faith belief that the factual predicate for the questions existed, (citation omitted). With regard to the question about Gabbard accusing appellant of stealing money from her son, the prosecutor attempted to question Gab-bard’s son about it in rebuttal. The question about Gabbard no longer wanting appellant to live with her related directly to appellant’s prior testimony that Gabbard had indicated this to him and to his acknowledgment that the two of them had discussed splitting up.
 

 Even if defense counsel should have objected to these questions, “failure to object to error, alone, is not enough to sustain a claim of ineffective assistance.” (citation omitted). We cannot say there is a reasonable probability that, but for these minor errors, the outcome of the trial or the sentencing decision would have been different.
 
 See Strickland, supra.
 
 Appellant’s eighteenth assignment of error is accordingly overruled.
 

 J.A. 1237.
 

 The Court has reviewed the record and is of the view that the appellate court’s
 
 *MLXVIII
 
 decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. Further, the Court is satisfied that the appellate court’s decision did not involve an unreasonable determination of the facts.
 

 To find that counsel, in failing to object to the questions set forth above, fell below an objective standard of reasonableness, the Court essentially would have to find that the prosecutor’s actions constituted obvious misconduct and that counsel’s failure to recognize and object to the misconduct was the result of gross neglect. The Court can find neither. The prosecution apparently had a good faith basis for asking petitioner whether Judith Gabbard had accused him of stealing $200 from her son’s wallet, as evidenced by the prosecution’s attempt, during the state’s rebuttal case, to question Gabbard’s son about the incident. J.A. 3925. Further, there was nothing unreasonable about the prosecutor asking petitioner whether Ms. Gabbard had decided not to allow him to continue living with her, in light of petitioner’s testimony that he and Gabbard were experiencing difficulties in their relationship and had contemplated ending that relationship. J.A. 3795-96, 3800. Thus, it is difficult to characterize as unreasonable or derelict counsel’s failure to object to questions for which there was a reasonable basis in the record. Counsel’s failure to object to those lines of questioning may very well have stemmed from counsel’s awareness that the prosecutor was permitted in cross examination to inquire as to those matters. Moreover, there is no reasonable probability that the outcome of petitioner’s trial would have been different, had defense counsel objected to those lines of questioning.
 

 The Court cannot find, under any reading of this record, that counsel performed unreasonably or to petitioner’s prejudice in failing to object to the instances of prose-cutorial questioning challenged by petitioner. The state courts, accordingly, did not adjudicate petitioner’s claim in a manner that contravened or unreasonably applied
 
 Strickland,
 
 This aspect of petitioner’s twelfth ground for relief must be denied.
 

 Failure to Object to Trial Eirors
 

 Finally, petitioner argues that defense counsel performed unreasonably and to his prejudice in failing to object to numerous errors throughout the trial. Specifically, according to petitioner, counsel:
 

 1. Failed to request an instruction requiring the jury to consider the element of voluntary manslaughter before returning any verdict.
 

 2. Failed to object to the trial court’s erroneous instruction regarding the burden of proof of the elements of voluntary manslaughter.
 

 3. Failed to object to the definition of reasonable doubt given to the jury.
 

 4. Failed to object to the introduction of State’s Exhibit 1, an inflammatory photo of Benge wearing a cap with the slogan, “No More Mr. Nice Guy.”
 

 5. Failed to object during closing arguments of the culpability phase when the prosecutor gave detailed descriptions of his personal opinions of what happened even though much of this was pure testimony and not based on evidence adduced at trial.
 

 6. Failed to object when the prosecutor introduced inadmissible hearsay which was used to bolster Awantha Shields’ testimony. Defense counsel also failed to object when the prosecutor appealed to the jurors’ emotions at certain points in closing arguments of the guilt phase of the trial.
 

 
 *MLXIX
 
 7. Failed to object when the prosecutor used his peremptory challenges to strike all death-scrupled jurors.
 

 8. Failed to object when the trial court tacitly encouraged jurors to take notes.
 

 (Petition, doc.no. 14, at ¶ 130).
 

 Petitioner raised this allegation on his direct appeals of right first to the state court of appeals, and then to the Supreme Court of Ohio. The Ohio Supreme Court rejected petitioner’s trial counsel ineffectiveness claims without addressing them in writing. The state appellate court concluded, with respect to petitioner’s claim that his attorneys failed to object to the trial errors set forth above, that all of those alleged trial errors had been considered and rejected by that court in earlier assignments of error
 
 [15]
 
 , and that petitioner therefore could not demonstrate either that his attorneys performed deficiently or that he was prejudiced. J.A. 1236. Having reviewed the court of appeals’ decision rejecting those assignments of error, in light of the trial record and controlling federal law, this Court cannot find that the appellate court’s decision was unreasonable. That being so, petitioner has not demonstrated that his attorneys performed unreasonably
 
 [16]
 
 or to his prejudice in failing to raise the objections set forth above, and the state courts’ decision rejecting this ineffective assistance of counsel claim did not contravene or unreasonably apply
 
 Strickland.
 

 For the foregoing reasons, the Court finds that petitioner’s twelfth ground for relief is without merit and must be denied.
 

 Thirteenth Ground for Relief
 
 — Michael
 
 Benge was denied the right to a fair trial, a reliable sentencing determination, and due process of law because the trial court refused to instruct the jury concerning the meaning of the life sentence possibilities and the realities of obtaining release on parole
 

 The argument set forth in petitioner’s thirteenth ground for relief challenges the refusal of the trial court to instruct the jury on the meaning of the life sentence possibilities and the realities of obtaining release on parole. In his traverse, however, petitioner expressly abandons this claim. Counsel for petitioner stated that the claim was “not sufficiently compelling to warrant the writ of habeas corpus,” that they discussed the matter with petitioner, and that he agreed with their decision to abandon the claim. (Traverse, doc.no. 47, at 74). Pursuant to petitioner’s express wishes, ground thirteen is denied.
 

 Fourteenth Ground for Relief
 
 — Ohio’s
 
 death penalty scheme is unconstitutional on its face and as applied because the constitutional imperatives that the sentencing authority’s discretion be guided and that its discretion be unfettered are irreconcilably in conflict
 

 Petitioner argued in his habeas corpus petition that Ohio’s death penalty scheme suffered from an irreconcilable conflict between the Eighth Amendment’s requirement that the sentencer’s discretion be guided on one hand, and unfettered on the other hand. (Petition, doc. no. 14, at ¶¶ 137-141). In his traverse, however, pe
 
 *MLXX
 
 titioner expressly abandons this claim based on counsel’s determination “that it is not sufficiently compelling to warrant the writ of habeas corpus.” (Traverse, doc.no. 47, at 75). That being so, petitioner’s fourteenth ground for relief is denied.
 

 Fifteenth Ground for Relief
 
 — Petitioner
 
 was convicted and sentenced to death under Ohio’s unconstitutional statutory definition of “beyond a reasonable doubt” in violation of the Due Process Clause
 

 Petitioner argues in his fifteenth ground for relief that Ohio’s statutory definition of “beyond a reasonable doubt” is constitutionally infirm, and that the trial court in this case compounded the error by amplifying the very language that unconstitutionally dilutes Ohio’s standard below that required by the Due Process Clause of the Fourteenth Amendment to support a criminal conviction. The Ohio Supreme Court summarily rejected this claim. Petitioner argues that this Court should review his claim
 
 de novo
 
 because the Ohio Supreme Court’s decision rejecting his claim on direct appeal, by not mentioning or applying federal law, does not constitute an adjudication on the merits. Petitioner argues in the alternative that his claim is meritorious and that the Ohio Supreme Court’s decision rejecting the claim involved an unreasonable application of clearly established Federal law.
 

 During the guilt phase of the trial, the trial court instructed the jury that the state was required to prove, beyond a reasonable doubt, each essential element of each crime charged. The trial court read Ohio’s statutory definition of “reasonable doubt,” R.C. § 2901.05(D), as follows:
 

 Reasonable doubt is present when after you have carefully considered and compared all the evidence you cannot say that you are firmly convinced of the truth of the charge.
 

 Reasonable doubt is based on reason and common sense. Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.
 

 Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and to act upon it in the most important of his own affairs.
 

 (Transcript, J.A. 4037-38). The trial court went on to instruct the jury:
 

 If after a full and impartial consideration of all the evidence you are firmly convinced of the truth of the charge, the State has proved its ease beyond a reasonable doubt and you must return a verdict of guilty.
 

 If you are not firmly convinced of the truth of the charge, you must find the defendant not guilty.
 

 (J.A. 4038).
 

 Petitioner argues that Ohio’s statutory definition of “reasonable doubt” allows for a criminal conviction on less proof than that required by the Due Process Clause of the Fourteenth Amendment. Petitioner argues that the “firmly convinced” language evokes the more lenient clear and convincing standard of proof. According to petitioner, an instruction to jurors that reasonable doubt exists only if jurors cannot say that they are firmly convinced of the truth of the charge incorporates explanations and terms virtually identical to those set forth in Ohio’s definition of a clear and convincing standard of proof—
 
 i.e.,
 
 evidence “which will provide in the mind of the trier of facts a
 
 firm belief or conviction
 
 to the facts sought to be established.” (Traverse, doc.no. 47, at 88-89) (quoting
 
 Cross v. Ledford,
 
 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus (1954)(emphasis added)).
 

 Petitioner also asserts that the United States Supreme Court, and a majority of federal circuit courts, have condemned the
 
 *MLXXI
 
 language defining reasonable doubt as “proof of such character that an ordinary person would be willing to rely and act upon in the most important of his own affairs.” (Traverse, doc.no. 47, at 87). Petitioner reasons that a prudent person weighing the risks involved in an important personal decision might decide to act
 
 mthout
 
 being convinced beyond a reasonable doubt that he had made the right decision.
 
 (Id.
 
 at 88). Petitioner also explains that, “[ojrdinary people who serve as jurors are frequently required to make important decisions based upon proof of a lesser nature by choosing the most preferable action.”
 
 (Id.).
 

 Petitioner raised this allegation on his direct appeals of right first to the state court of appeals, and then to the Supreme Court of Ohio. The Ohio Supreme Court, relying on its earlier decision in
 
 State v. Poindexter,
 
 36 Ohio St.3d 1, 520 N.E.2d 568 (1988), rejected petitioner’s claim without addressing it in writing.
 
 Benge,
 
 75 Ohio St.3d at 139, 661 N.E.2d 1019. The state appellate court determined that petitioner’s claim was without merit:
 

 The trial court’s instruction to the jury on reasonable doubt was in conformity with R.C. 2901.05(D). It is well-settled that no error is committed when a trial court gives an instruction defining reasonable doubt according to R.C. 2901.05(D). (citations omitted). Although the trial court amplified its instruction somewhat beyond the statutory definition, this amounted to a mere paraphrasing of the instruction. On the whole, the instruction adequately conveyed the concept of reasonable doubt to the jury, (citation omitted). Appellant’s thirteenth assignment of error is accordingly overruled.
 

 J.A. 1234-35.
 

 The Court cannot find that the state appellate court’s decision contravened or unreasonably applied clearly established Supreme Court precedent. In
 
 In re Winship,
 
 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Supreme Court held that the Due Process Clause requires criminal convictions be based on “proof beyond a reasonable doubt of every fact necessary to constitute the crime.” In rejecting petitioner’s claim, the state court of appeals relied on Ohio decisions that discussed and applied the
 
 Winship
 
 standard.
 
 State v. Benge,
 
 Case No. CA93-06-116, 1994 WL 673126, **18-19, 1994 Ohio App. LEXIS 5419, at *51-52 (Ohio App. 12 Dist. Dec.5, 1994); J.A. at 1234-35 (citing
 
 State v. VanGundy,
 
 64 Ohio St.3d 230, 594 N.E.2d 604 (1992);
 
 State v. Nabozny,
 
 54 Ohio St.2d 195, 375 N.E.2d 784 (1978)). Having reviewed the trial record and relevant law, this Court is satisfied that the state appellate court correctly identified and reasonably applied controlling Supreme Court precedent.
 

 Petitioner’s arguments challenging the constitutionality of Ohio’s reasonable doubt standard, as written and as “amplified” by the trial court, essentially are foreclosed by Sixth Circuit precedent. In
 
 Thomas v. Arn,
 
 704 F.2d 865, 867-69 (6th Cir.1983), the Sixth Circuit concluded that Ohio’s statutory definition of reasonable doubt comported with the Due Process Clause. With respect to the “willing to act” language challenged herein by petitioner, the Sixth Circuit concluded after considerable analysis that, while the “willing to act” language had been criticized by many courts, that language had never, to the Sixth Circuit’s knowledge, provided the basis for relief.
 
 Id.
 
 at 868-69. The Sixth Circuit suggested, as the Supreme Court has often reiterated, that the relevant inquiry with respect to jury instructions on the reasonable doubt standard is whether, as a whole, the instruction correctly conveys the concept to jurors.
 
 Id.
 
 at 869;
 
 See, e.g., Victor v. Nebraska,
 
 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). In
 
 *MLXXII
 

 Coleman v. Mitchell,
 
 268 F.3d 417, 436-37 (6th Cir.2001),
 
 cert. denied,
 
 535 U.S. 1031, 122 S.Ct. 1639, 152 L.Ed.2d 647 (2002), the Sixth Circuit considered and rejected the argument that the “firmly convinced” language in Ohio’s statutory definition of reasonable doubt actually evoked a clear and convincing standard of proof.
 
 See also Buell v. Mitchell,
 
 274 F.3d 337, 366 (“This court has determined that Ohio’s statutory definition of reasonable doubt does not offend due process.”).
 

 In light of the foregoing, the Court concludes that petitioner’s fifteenth ground for relief is insufficient to warrant habeas corpus relief, and that the Ohio courts’ decision rejecting petitioner’s claim did not involve an unreasonable application of clearly established Supreme Court precedent. The Court finds nothing unreasonable about the state appellate court’s conclusion that the trial court’s reasonable doubt instruction, as a whole, adequately conveyed to jurors the concept of proof beyond a reasonable doubt. Petitioner’s fifteenth ground for relief is denied.
 

 Sixteenth Ground for Relief
 
 — Michael
 
 Benge’s rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated because Ohio’s death penalty scheme is unconstitutional on its face and as applied
 

 In his sixteenth ground for relief
 
 [17]
 
 , petitioner raises a litany of attacks on the constitutionality of Ohio’s death penalty statutes. (Petition, doc.no. 14, at ¶¶ 149-164; Traverse, doc.no. 47, at 76-89). Petitioner raised these arguments on direct appeal. The Ohio Supreme Court summarily rejected petitioner’s claim without opinion.
 
 Benge,
 
 75 Ohio St.3d at 139, 661 N.E.2d 1019. The court of appeals, citing Ohio Supreme Court decisions that had already addressed petitioner’s arguments, also summarily rejected petitioner’s claim. J.A. 1236. Nearly all of the constitutional challenges raised or alluded to by petitioner are foreclosed by Sixth Circuit precedent. At the outset, it should be noted that the Court of Appeals for the Sixth Circuit has upheld the constitutionality of Ohio’s death penalty statutes.
 
 Smith v. Mitchell,
 
 348 F.3d 177, 214 (6th Cir.2003)(citing
 
 Buell v. Mitchell,
 
 274 F.3d 337, 367-70 (6th Cir.2001);
 
 Byrd v. Collins,
 
 209 F.3d 486, 539 (6th Cir.2000),
 
 cert. denied,
 
 531 U.S. 1082, 121 S.Ct. 786, 148 L.Ed.2d 682 (2001)). Of Ohio’s capital punishment scheme, the Sixth Circuit recently remarked:
 

 We note that the Ohio death penalty statute includes a number of capital sentencing procedures that the United States Supreme Court held in
 
 Gregg v. Georgia,
 
 428 U.S. 153, 188-95, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), specifically to reduce the likelihood of arbitrary and capricious imposition of the death penalty. These procedures include: (1) consideration of a pre-sentence report by the sentencing authority; (2) jury sentencing where the jury is adequately informed and given meaningful standards to guide its use of the information; (3) a bifurcated guilt phase/sentencing phase trial; (4) weighing of aggravating circumstances and mitigating factors; (5) a sentencing decision based on specific findings; and (6) meaningful appellate review.
 

 Buell v. Mitchell, supra,
 
 274 F.3d at 367. Against this backdrop, the Court will consider petitioner’s various challenges.
 

 Petitioner argues that Ohio’s capital punishment scheme violates the Eighth Amendment’s prohibition against cruel and unusual punishment. One component of
 
 *MLXXIII
 
 petitioner’s argument is that the death penalty is neither the least restrictive nor an effective mean of deterrence. To the extent that he is arguing that capital punishment in general, and Ohio’s capital punishment scheme specifically, is cruel and unusual because it is excessive, petitioner’s argument must fail under
 
 Gregg v. Georgia,
 
 428 U.S. 153, 179-82, 96 S.Ct. 2909, 49 L.Ed.2d 859. In
 
 Gregg v. Georgia,
 
 the Supreme Court considered all of these arguments and held that the punishment of death does not invariably violate the Constitution, in that it is neither excessive nor disproportionate.
 
 See also Smith v. Mitchell, supra,
 
 348 F.3d at 213-14;
 
 Buell v. Mitchell, supra,
 
 274 F.3d at 367, 370;
 
 Greer v. Mitchell,
 
 264 F.3d 663, 690 (6th Cir.2001)(noting that Supreme Court has rejected the challenge that the death penalty is cruel and unusual because it is excessive), cert.
 
 denied,
 
 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
 

 Another argument raised by petitioner is that Ohio’s scheme, due to the unfettered discretion enjoyed by prosecutors, allows for arbitrary and discriminatory imposition of the death penalty. The result of shielding from review the process of deciding who is to be sentenced to death, petitioner argues, is that blacks and those who kill white victims are much more likely to get the death penalty. According to petitioner, while African-Americans make up less than twenty per cent of Ohio’s population, they comprise half of Ohio’s death row population. Petitioner’s arguments, however persuasive, are foreclosed by Sixth Circuit precedent.
 

 With respect to petitioner’s argument that uncontrolled discretion exercised by prosecutors in the capital indictment process creates an impermissible risk of arbitrary infliction of the death penalty, the Sixth Circuit has said, “these ‘discretionary stages’ do not implicate the concerns [about arbitrariness, capriciousness, and discrimination] expressed in
 
 Furman v. Georgia,
 
 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).”
 
 Wickline v. Mitchell,
 
 319 F.3d 813, 824 (6th Cir.),
 
 cert. denied,
 
 — U.S. -, 124 S.Ct. 405, 157 L.Ed.2d 291 (2003);
 
 see also Coleman v. Mitchell
 
 268 F.3d 417, 442 (6th Cir.2001),
 
 cert. denied sub nom. Coleman v. Bagley,
 
 535 U.S. 1031, 122 S.Ct. 1639, 152 L.Ed.2d 647 (2002). Moreover, the Sixth Circuit has consistently rejected constitutional challenges based upon claims that race plays a part in the application of capital punishment in Ohio.
 
 See, e.g., Greer v. Mitchell, supra,
 
 264 F.3d at 690 (holding that petitioner “failed to demonstrate a constitutionally significant risk of racial bias affecting the Ohio capital sentencing process.”);
 
 Coleman v. Mitchell, supra,
 
 268 F.3d at 441-42 (citing
 
 McCleskey v. Kemp,
 
 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). As to these race-based claims, petitioner has advanced no evidence or arguments not previously addressed, and rejected, by the Sixth Circuit. Thus, the Ohio courts’ decision rejecting this component of petitioner’s sixteenth ground for relief was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.
 

 Petitioner further argues that Ohio’s death penalty system creates a substantial risk of arbitrary and capricious application, in violation of his due process and equal protection rights. Petitioner cites as an example the fact that Ohio’s statutes do not require as the culpable mental state for death-eligible murder the conscious desire to kill nor do they require premeditation and deliberation. A related argument is that Ohio’s felony-murder by statute, by not requiring that intent to commit the felony precede the murder, “would appear to allow death eligibility when the felony was merely an afterthought to the murder.” (Traverse, doc.no. 47, at 82). Petitioner also points to the fact that Ohio’s
 
 *MLXXIV
 
 statutes do not require the State to prove the absence of mitigating factors or that death is the only appropriate penalty. Petitioner argues that the statutory scheme is unconstitutionally vague. Finally, petitioner argues that the statutory scheme has devalued the importance of mitigation evidence because no method exists to ensure proper weighing and consideration of mitigating evidence. These arguments have been squarely rejected by the Sixth Circuit, and do not demonstrate that Ohio’s death penalty system allows for the arbitrary imposition of the death penalty in violation of the Eighth and Fourteenth Amendments.
 

 Petitioner’s argument challenging the failure of the Ohio death penalty scheme to require premeditation or deliberation as the culpable mental state for all capital defendants is foreclosed by Sixth Circuit precedent. Citing
 
 Tison v. Arizona,
 
 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the Sixth Circuit held in
 
 Greer v. Mitchell, supra,
 
 264 F.3d at 691, that “such a conscious desire to kill is not required in order to impose the death penalty.”
 
 See also Coleman v. Mitchell, supra,
 
 268 F.3d at 442 (holding that imposing death for felony murder, even in the absence of proof of premeditation or deliberation, is consistent with the Eighth Amendment). Petitioner’s argument regarding the fact that the State is not required to prove the absence of mitigating factors consistently has been rejected by the Sixth Circuit. Citing
 
 Buchanan v. Angelone,
 
 522 U.S. 269, 275-76, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998), the Sixth Circuit in
 
 Smith v. Mitchell, supra,
 
 348 F.3d at 213-14, stated that the Constitution contains no such requirement.
 
 See also Buell v. Mitchell, supra,
 
 274 F.3d at 367-68;
 
 Greer v. Mitchell, supra,
 
 264 F.3d at 691.
 

 Regarding petitioner’s argument that Ohio’s scheme is unconstitutional for not including a specific method to ensure proper weighing of mitigation evidence, petitioner’s argument finds no support in the law. The Constitution does not require that “numeric weights” be assigned to aggravating circumstances and mitigating factors, or that the aggravating circumstances
 
 substantially
 
 outweigh the mitigation factors, but rather requires only that the sentencer’s discretion be directed and limited enough to prevent wholly arbitrary and capricious action. “A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision.”
 
 Tuilaepa v. California,
 
 512 U.S. 967, 979, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994);
 
 see also California v. Ramos,
 
 463 U.S. 992, 1008-1009 n. 22, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983);
 
 Zant v. Stephens,
 
 462 U.S. 862, 875, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983);
 
 Proffitt v. Florida,
 
 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Ohio’s scheme sufficiently enumerates specific factors that the sentencer must evaluate, and a general framework for that evaluation. Ohio provides a detailed, structured scheme under which: (1) the death penalty for aggravated murder is prohibited unless at least one of eight aggravating circumstances is specified in the indictment and proven beyond a reasonable doubt; after which (2) the defendant has great latitude in second phase to go forward with mitigation evidence; and (3) the prosecutor proves beyond a reasonable doubt in second phase that the aggravating circumstances outweigh mitigating factors; after which (4) the trial court undertakes its own, independent review of the aggravating circumstances and mitigating factors.
 

 Accordingly, the Sixth Circuit rejected similar arguments in
 
 Buell v. Mitchell, supra.
 
 There, the Sixth Circuit pointed out that the United States Supreme Court has upheld a capital punishment scheme “that did not enunciate specific factors to
 
 *MLXXV
 
 consider or a specific method of balancing the competing considerations.”
 
 Buell, supra,
 
 274 F.3d at 368 (citing
 
 Franklin v. Lynaugh,
 
 487 U.S. 164, 172-73, 108 S.Ct. 2320, 101 L.Ed.2d 165 (1988);
 
 Zant v. Stephens,
 
 462 U.S. 862, 876, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)). Citing
 
 Blystone v. Pennsylvania,
 
 494 U.S. 299, 305, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), the Sixth Circuit also noted that a death sentence is constitutional if it “ ‘is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances.’ ”
 
 Buell,
 
 274 F.3d at 368 (quoting
 
 Blystone,
 
 494 U.S. at 305, 110 S.Ct. 1078). The Sixth Circuit recently reiterated its holding in
 
 Buell.
 
 Addressing the petitioner’s argument that Ohio’s scheme gives the sentencer too much discretion and fails to define terms such as “weighing” and “mitigating,” the Sixth Circuit noted that, “The Constitution contains no such requirements.”
 
 Smith v. Mitchell, supra,
 
 348 F.3d at 213-14 (citing
 
 Buchanan v. Angelone,
 
 522 U.S. 269, 275-76, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998)).
 
 See also Coleman v. Mitchell, supra,
 
 268 F.3d at 442-3 (holding that Ohio’s scheme provides sufficient guidance to the sentencer).
 

 Petitioner also charges that Ohio’s scheme of requiring proof of aggravating circumstances during the guilt phase of the trial effectively prohibits individualized consideration of the offender. Petitioner’s argument has been squarely rejected by the Sixth Circuit. In
 
 Coleman v. Mitchell,
 
 268 F.3d at 443, the Sixth Circuit stated that Ohio’s scheme was consistent with the Supreme Court’s decision in
 
 Lowenfield v. Phelps, supra,
 
 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568. There, the Supreme Court explained:
 

 The use of “aggravating circumstances” is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury’s discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.
 

 Lowenfield,
 
 484 U.S. at 244-45, 108 S.Ct. 546. The Sixth Circuit reiterated its approval of this aspect of Ohio’s scheme in
 
 Smith v. Mitchell, supra,
 
 348 F.3d at 213-14. Accordingly, the Ohio courts’ decision rejecting this component of petitioner’s sixteenth claim for relief was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.
 

 Another argument raised by petitioner is that Ohio’s scheme is unconstitutional because it imposes an impermissible risk of death on those capital defendants who exercise their right to go to trial. Specifically, petitioner argues the provisions of Ohio R.Crim. P. 11(C)(3) needlessly encourage the entry of guilty pleas and the concomitant waiver of the rights to a trial by jury, confrontation, and compulsory process. Singling out the provision of Crim.R. 11(C)(3) which permits a trial judge, “in the interests of justice,” to dismiss the capital specifications from an indictment when the accused pleads guilty or no contest, petitioner argues that the statute fails to set forth sufficient standards defining the concept of the “interests of justice.” Ohio’s scheme is not rendered unconstitutional by the fact that, when a defendant charged with at least one capital specification pleads guilty, the sentencing judge has the option of dismissing the death penalty specification “in the interests of justice.” Although the Supreme Court struck down a statutory provision where a guilty plea
 
 automatically
 
 left the defendant ineligible for the death penalty,
 
 United States v. Jackson,
 
 390 U.S. 570, 88
 
 *MLXXVI
 
 S.Ct. 1209, 20 L.Ed.2d 138 (1968), the Supreme Court has never held that it is impermissible to structure a statute where the defendant might plead guilty to avoid the
 
 'possibility
 
 of death sentence, inasmuch as there is no
 
 per se
 
 rule against encouraging guilty pleas.
 
 See Corbitt v. New Jersey,
 
 439 U.S. 212, 223, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978);
 
 Spinkellink v. Wainwright,
 
 578 F.2d 582, 608-609 (5th Cir.1978)(citing
 
 Brady v. United States,
 
 397 U.S. 742, 747, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)),
 
 cert. denied,
 
 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). Under Ohio’s rules, unlike the statutory provision at issue in
 
 Jackson,
 
 one who pleads guilty to an indictment containing a death penalty specification is still
 
 eligible
 
 for the death penalty.
 
 See Spinkellink, supra,
 
 578 F.2d at 608. For these reasons, the Court is not persuaded that Ohio R.Crim. P. 11(C)(3) chills a capital defendant’s exercise of his right not to plead guilty in violation of
 
 Jackson, supra.
 

 The Sixth Circuit has rejected the argument that the provisions of Crim. R. 11(C)(3) impermissibly encourage guilty pleas in capital cases.
 
 See Cooey v. Coyle,
 
 289 F.3d 882, 924-25 (6th Cir.2002)(noting that petitioner offered no constitutional authority to support claim that Crim. R. 11(C)(3) impermissibly encouraged guilty pleas in capital cases),
 
 cert. denied,
 
 538 U.S. 947, 123 S.Ct. 1620, 155 L.Ed.2d 489 (2003);
 
 see also Wickline v. Mitchell, supra,
 
 319 F.3d at 824. Accordingly, the Ohio courts’ decision rejecting this component of petitioner’s sixteenth claim for relief did not contravene or unreasonably apply clearly established Supreme Court precedent.
 

 Petitioner also takes issue with the provision in Ohio’s capital punishment scheme,
 
 i.e.,
 
 R.C. § 2929.03(D)(1), that requires any presentence investigation report and mental examination requested by the defendant to be submitted to the jury or three-judge panel. Petitioner argues that the mandatory submission prevents the accused from effectively presenting his own mitigation case. Petitioner’s argument has been rejected by the Sixth Circuit. In
 
 Cooey v. Coyle, supra,
 
 289 F.3d at 925-26, the Sixth Circuit described the petitioner’s challenge against Ohio’s rule requiring mandatory submission of presen-tenee reports and mental evaluations as “utterly implausible,” and went on to conclude that, “we could find no case where the Constitution has been construed as forbidding such a rule.” Thus, this component of petitioner’s sixteenth claim for relief does not warrant habeas relief.
 

 Petitioner’s next set of arguments assails the adequacy of appellate review under Ohio’s death penalty scheme. Specifically, petitioner argues that the scheme employs an insufficient appropriateness review, insofar as the data supplied to appellate courts and the Ohio Supreme Court following guilty pleas to lesser offenses and other charge reductions at trial is inadequate to permit meaningful review and comparison, the sentencer is not required to identify what mitigating factors it found to exist, the trial court is not required to issue a written decision following imposition of a life sentence, and the appropriateness review set forth in R.C. § 2929.05(A) has become a cursory ritual. Petitioner argues that Ohio’s scheme employs a faulty proportionality review because only those cases in which the death sentence was imposed are utilized for the comparison. These arguments have been considered and rejected by the Sixth Circuit.
 

 In
 
 Buell v. Mitchell,
 
 274 F.3d at 368, the Sixth Circuit rejected the argument that Ohio’s proportionality review is inadequate “because no proportionality review is constitutionally required.”
 
 Id.
 
 (citing
 
 Pulley v. Harris,
 
 465 U.S. 37, 44-51,
 
 *MLXXVII
 
 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)).
 
 See also Smith v. Mitchell,
 
 348 F.3d at 213-14 (holding that comparative proportionality review is not constitutionally required); Greer
 
 v. Mitchell,
 
 264 F.3d at 691 (holding that there is no Eighth Amendment right to proportionality review);
 
 Coe v. Bell,
 
 161 F.3d 320, 352 (6th Cir.1998)(same),
 
 cert. denied,
 
 528 U.S. 1039, 120 S.Ct. 567, 145 L.Ed.2d 442 (1999).
 

 As to petitioner’s arguments that meaningful appellate review is thwarted by the fact that the jury or three-judge panel is not required to issue specific findings, the Sixth Circuit in
 
 Buell
 
 concluded that Ohio’s scheme provided for adequate appellate review in this regard:
 

 [UJnder Ohio’s scheme, the trial judge is given the statutory responsibility to reweigh the aggravating circumstances and mitigating factors before determining whether to impose a death sentence or a life sentence. Ohio Rev.Code § 2929.03(D)(3). Then, the trial judge must state his sentencing findings in a separate opinion. Ohio Rev.Code § 2929.03(F). As a result, the appellate courts have both the trial judge’s sentencing opinion and the trial record for review.
 

 Buell,
 
 274 F.3d at 368-69. With respect to petitioner’s argument that Ohio’s appellate courts have failed to comply with the appropriateness review required by R.C. § 2929.05(A), the Court notes that the Sixth Circuit has cited the appropriateness review set forth in R.C. § 2929.05(A) with approval.
 
 See Buell v. Mitchell, supra,
 
 274 F.3d at 368-69.
 

 The Ohio appellate courts are required under R.C. § 2929.05(A) to determine whether the sentence of death is appropriate. That section provides in relevant part:
 

 In determining whether the sentence of death is appropriate, the court of appeals ... and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. * * * The court of appeals ... or the supreme court shall affirm a sentence of death only if the particular court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case.
 

 R.C. § 2929.05(A). Petitioner has not demonstrated, and the Court is not otherwise persuaded, that the “appropriateness” review employed by the appellate courts in Ohio ultimately is constitutionally infirm. Decisions issued by the United States Supreme Court appear to regard the “appropriateness” of a death sentence as the individualized sentencing determination that is undertaken after a jury or trial court has concluded that a defendant is eligible for the death penalty.
 
 See Blystone v. Pennsylvania,
 
 494 U.S. 299, 305, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990);
 
 California v. Ramos,
 
 463 U.S. 992, 1007, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983);
 
 Woodson v. North Carolina,
 
 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Under Ohio’s capital punishment scheme, appropriateness of the death penalty is determined when the sentencing body, having already found that a defendant convicted of aggravated murder is death-eligible because one or more aggravating circumstances has been proven beyond a reasonable doubt, undertakes a separate review of whether the aggravating circumstances outweigh any mitigating factors. The courts of appeals and Ohio Supreme Court are obligated, not only to review the trial court’s assessment, but also to independently determine whether the sentence is proportionate, non-excessive, and appropriate based on the record of aggravating circumstances and mitigating factors.
 
 *MLXXVIII
 
 The Court is satisfied that Ohio’s scheme identifies those death-eligible defendants who are actually deserving of the death sentence within the confines of the Eighth Amendment, as set forth in
 
 Gregg v. Georgia, supra.
 
 For the foregoing reasons, the Court is satisfied that the Ohio courts’ decision denying those components of petitioner’s constitutional challenge assailing the adequacy of appellate review in death penalty cases did not contravene or unreasonably apply Supreme Court precedent.
 

 Finally, petitioner argues that Ohio’s scheme is constitutionally infirm for not allowing the sentencer to exercise mercy by recommending life, when there are only aggravating circumstances. Petitioner argues that the result is a mandatory death penalty, which contravenes the Eighth and Fourteenth Amendments.
 

 Ohio’s scheme is not unconstitutional for not allowing the sentencer the option to impose life even where the aggravating circumstances outweigh the mitigating factors, or where there are no mitigating factors, because the Constitution does not require such unfettered discretion.
 
 Boyde v. California,
 
 494 U.S. 370, 377, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990);
 
 Blystone v. Pennsylvania,
 
 494 U.S. 299, 305, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990).
 
 Gregg
 
 makes it clear that a sentencer may not exercise unbridled discretion, but rather, must exercise discretion that is suitably directed and limited. Allowing a sentencer to impose a life sentence even when the aggravating circumstances outweigh the mitigating factors would run afoul of these principles and allow for the very arbitrariness and capriciousness that petitioner purports to condemn, by inviting the sen-tencer to disregard the sentencing procedures mandated by the state legislature within the confines of the Constitution.
 

 In
 
 Boyde,
 
 the petitioner challenged the trial court’s penalty phase instruction to the jury that, “[i]f you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death.”
 
 Boyde,
 
 494 U.S. at 374, 110 S.Ct. 1190. The petitioner reasoned that the mandatory nature of that instruction prevented the jury from making an individualized assessment of the appropriateness of the death penalty. The Supreme Court flatly rejected that argument:
 

 Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances “outweigh” the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence “in an effort to achieve a more rational and equitable administration of the death penalty.”
 

 Boyde,
 
 494 U.S. at 377, 110 S.Ct. 1190 (quoting
 
 Franklin v. Lynaugh,
 
 487 U.S. 164, 181, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)). In
 
 Blystone,
 
 the Supreme Court rejected the petitioner’s challenge of the provision in Pennsylvania’s death penalty statute requiring the jury to impose death if it found at least one aggravating circumstance and no mitigating circumstances, holding that the statute satisfied the requirement that a capital sentencing jury be allowed to consider and give effect to all relevant mitigating evidence, and that the statute was not “mandatory” insofar as it did automatically impose death upon conviction for certain types of murder.
 
 Blystone,
 
 494 U.S. at 305, 110 S.Ct. 1078.
 

 Ohio’s capital punishment scheme does not create a mandatory death penalty. Under Ohio’s scheme, an offender is death-eligible only if the sentencer finds him guilty beyond a reasonable doubt of aggravated murder and at least one specification, and only if, after a mitigation phase,
 
 *MLXXIX
 
 the sentencer concludes that the aggravating circumstances outweigh the mitigating factors. Ohio’s capital punishment statutes, therefore, do not create a mandatory death penalty, and do not violate the Eighth or Fourteenth Amendments by not providing the sentencer with the option of imposing a life sentence when there are no mitigating factors or when the aggravating circumstances outweigh the mitigating factors.
 

 The Sixth Circuit has consistently relied upon Supreme Court precedent to reject arguments similar to those raised by petitioner herein. In
 
 Buell v. Mitchell,
 
 274 F.3d at 367-68, the Sixth Circuit explicitly rejected the petitioner’s argument that Ohio’s scheme is constitutionally infirm for failing to provide the sentencing authority with an option to recommend a life sentence when aggravating circumstances only slightly outweigh mitigating factors or where no mitigating factors have been established.
 
 See also Coleman v. Mitchell,
 
 268 F.3d at 442 (holding that Ohio’s scheme is not a mandatory death penalty statute in violation of the Eighth Amendment).
 

 The Court concludes that petitioner’s sixteenth ground for relief is without merit.
 
 [18]
 
 More specifically, the Court concludes that the Ohio courts’ decision rejecting petitioner’s constitutional challenge to Ohio’s death penalty statutes was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.
 

 III. Conclusion
 

 For the foregoing reasons, petitioner’s habeas corpus claims are DENIED and this habeas corpus action is DISMISSED. The clerk is hereby directed to enter judgment closing this case.
 

 [1]
 

 . In determining whether a state court’s adjudication was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, this Court must presume as correct any factual findings made by the state courts, unless petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).
 

 [2]
 

 . There were other variances between Fuller's witness statement and grand jury testimony concerning details such as whether Fuller and petitioner left the apartment together to purchase drugs, and when Fuller picked up the newspaper in which Shields eventually read the story about a woman’s body being found in the river.
 

 [3]
 

 . Petitioner also argued in his traverse that "[a]n evidentiary hearing is needed to determine the specifics of any arrangements between the prosecution and Mr. Fuller and/or Ms. Shields and more fully develop the basis for this argument.” (Traverse, doc.no. 47, at 9). Petitioner's suggestion that there was some sort of agreement between the prosecution, Fuller, and/or Awantha Shields finds absolutely no support in the record and is entirely speculative. That being so, petitioner has alleged insufficient facts to persuade this Court that an evidentiary is necessary, or would even be helpful, to address petitioner’s third ground for relief.
 

 [4]
 

 . The two death penalty specifications upon which petitioner was charged and convicted were merged pursuant to R.C. § 2941.25(A). The first death penalty specification charged commission of the offense for the purpose of escaping detection for another offense in violation of R.C. § 2929.04(A)(3). The second death penalty specification charged commission of the offense during the course of the commission of aggravated robbery in violation of R.C. § 2929.04(A)(7).
 

 [5]
 

 . Of course, any factual determinations made by the state courts are presumed correct, absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).
 

 [6]
 

 . Petitioner cites
 
 DePew v. Anderson,
 
 104 F.Supp.2d 879, 883 (S.D.Ohio 2000)(citing
 
 Boyle v. Million,
 
 201 F.3d 711 (6th Cir.2000)).
 

 [7]
 

 .
 
 See, e.g.,
 
 J.A. 3929 ("I want to remind you that I previously instructed you that what an attorney says is not evidence.”); J.A. 3932 ( [by Mr. Piper on behalf of the state]: ''[I] also want to hold you to a commitment that I asked for in voir dire which is not to decide this case based on the personalities of the attorneys or our behavior or our conduct or something that’s something other than the evidence.”).
 

 [8]
 

 . This Court has reviewed the transcript and is aware of some of the other instances of misconduct noted by petitioner, such as the prosecution’s suggestion that defense counsel were "low” for putting petitioner’s daughter on the stand, (J.A. 4215); the prosecution’s speculation about facts not in evidence, (J.A. 4065), and the prosecution’s comment that defense counsel had "a job to do,” (J.A. 4257). While these various incidents may not be characterized as isolated or inadvertent, neither can they be characterized as a pattern of misconduct that tainted the trial. A review of the transcript in its entirety reveals that these instances were mere moments in time during a lengthy, detailed trial.
 
 See Donnelly v. DeChristoforo,
 
 416 U.S. at 645, 94 S.Ct. 1868 (“the prosecutor's remark here, admittedly an ambiguous one, was but one moment in an extended trial.... ”).
 

 [9]
 

 . Petitioner cites
 
 DePew v. Anderson,
 
 104 F.Supp.2d 879, 883 (S.D.Ohio 2000)(citing
 
 Boyle v. Million,
 
 201 F.3d 711 (6th Cir.2000)).
 

 [10]
 

 . R.C. § 2929.04(B)(3) permits the sentencer to consider as mitigating: "Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.”
 

 [11]
 

 . "Judge Sage will instruct you on the law.” (J.A. 4210);
 

 "What you have to determine is does the aggravating circumstance which the State has proved to you beyond a reasonable doubt as existing, to wit, the murder of Judy Gabbard in the commission of aggravated robbery, does that outweigh the mitigating factors.” (J.A. 4210-11);
 

 "The judge will give you the law on how to weigh it..." (J.A. 4213);
 

 "The aggravating circumstance is that he beat her and killed her and murdered her while committing aggravated robbery.” (J.A. 4246);
 

 "Now, the State has to prove an aggravating circumstance....” (J.A. 4253);
 

 "[W]hat I am saying is go by the law.” (J.A. 4260).
 

 [12]
 

 . Petitioner argued in his eighteenth proposition of law that his trial attorneys were ineffective for failing to file a motion to suppress, failing to object to unfounded innuendo by the prosecution, and failing to object to numerous trial errors. (Merit Brief, J.A. 1456-63). The Supreme Court of Ohio did not expressly address these allegations in writing, but stated that it had considered and rejected all of petitioner’s propositions of law.
 
 Benge,
 
 75 Ohio St.3d at 139, 661 N.E.2d 1019.
 

 [13]
 

 . Testifying on petitioner's behalf were Dr. Roger Fisher, Juanita Babb (petitioner's mother), Scott Fleener (petitioner’s supervisor for four years), Mary Kathleen Newberry (friend), Charlie Benge (petitioner’s uncle), Barbara Benge Reed (petitioner's sister), and Tabatha Benge (petitioner’s daughter).
 

 [14]
 

 . Affidavits were submitted by Juanita Babb (petitioner’s mother), Barbara Reid (petitioner's older sister), Vickie Fleenor (petitioner's younger sister), William Chandler (petitioner's uncle), Peggy Ferneding (petitioner’s ex-wife), and Jonathon Wolf (friend.) J.A.2064-2085. The references by these affiants to incidents of violence between petitioner and Judy Gabbard were unspecific and somewhat one-sided, and some of the affiants conceded that they never personally witnessed any verbal or physical violence between petitioner and Gabbard.
 

 [15]
 

 . The alleged trial errors to which counsel failed to object were presented to the court of appeals as claims in their own right in assignments of error one, five, six, ten, eleven, twelve, thirteen, and fourteen.
 

 [16]
 

 . As noted
 
 supra
 
 in connection with petitioner’s first claim for relief, the Court concluded that petitioner's trial attorneys performed de-ficiently in failing to object to the trial court’s erroneous instruction telling the jury that, if it found petitioner guilty of aggravated murder beyond a reasonable doubt, it need not consider the lesser charge of voluntary manslaughter. The Court went on to conclude, however, that petitioner was not prejudiced by defense counsel's deficient performance in this regard.
 

 [17]
 

 . Petitioner merged his seventh and eighth grounds for relief with his sixteenth ground for relief because they also presented challenges to the constitutionality of Ohio's death penalty scheme. (See Traverse, doc.no. 47, at 28-29).
 

 [18]
 

 . The Court also concludes that petitioner’s seventh and eighth grounds for relief are without merit. Petitioner merged those grounds with his sixteenth ground for relief. (Traverse, doc.no. 47, at 28-29).